Docket No. 93579–Agenda 2–March 2003.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES

MASTERSON, Appellant.

Opinion filed October 2, 2003.

JUSTICE RARICK delivered the opinion of the court:

Respondent, James Masterson, was charged with two counts of attempted aggravated criminal sexual assault and two counts of indecent solicitation of a child. During the pendency of the criminal charges, the State instituted civil commitment proceedings, seeking to have respondent declared a sexually dangerous person as that term is defined in section 1.01 of the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/1.01 (West 1998)). After a hearing on the State’s petition, the circuit court declared respondent a sexually dangerous person and ordered his commitment. Respondent’s motion to reconsider was denied, and he appealed.

The appellate court affirmed the judgment of the circuit court. No. 1–99–1318 (unpublished order under Supreme Court Rule 23). We ultimately allowed respondent’s petition for leave to appeal (177 Ill. 2d R. 315(a)).

Before this court, respondent argues that his commitment as a sexually dangerous person should be reversed because (1) the evidence was insufficient to satisfy the constitutional requirement that he has “serious difficulty” controlling sexually dangerous behavior, (2) the State’s evidence was insufficient to satisfy the statutory requirement that he committed the criminal act which served as the basis for civil commitment, and (3) the appellate court erred in relying exclusively on a purported 1984 conviction to meet the demonstrated propensities requirement of the SDPA.

BACKGROUND

On February 17, 1997, respondent was charged by indictment in the circuit court of Cook County with two counts of attempted aggravated criminal sexual assault and two counts of indecent solicitation of a child. The intended victim was a 12-year-old girl. Criminal charges were pending when, on January 20, 1998, the State filed a petition to declare respondent a sexually dangerous person. The State requested the appointment of two psychiatrists to examine respondent. Pursuant to the circuit court’s order, respondent was subsequently examined by Drs. Stafford Henry and Haidari Shikari. After examining the respondent, both concluded that respondent qualified as a sexually dangerous person as defined in the SDPA. The record indicates that a third psychiatrist, Dr. Henry Lahmeyer, later examined respondent pursuant to respondent’s request, and came to the same conclusion.

A hearing was held on the petition on February 8, 1999. At the hearing, Anna K. testified that she and respondent had been involved in a sexual relationship for four or five years when, on February 15, 1997, he gave her a letter wherein he stated that he wanted to “rub up against” her 12-year-old daughter, T.K., and look at pornographic magazines and videos with T.K. Although respondent emphasized that both he and T.K. would be fully clothed, he expressed his desire to either massage T.K. or simulate anal intercourse with her. Anna testified that respondent often paid her to perform sexual acts and respondent indicated he would pay both her and T.K. if Anna allowed him to engage in the acts described in the letter.

Anna gave the letter to a police officer, who told her to tell respondent she would agree to the requests outlined in the letter. Respondent telephoned several times that day, and each time Anna assured him that she would agree to his requests. She planned to meet with respondent on February 17 so respondent could give her the money requisite to a meeting with T.K.

On February 17, respondent drove Anna to a store to pick up some products he had ordered. At that time, Anna noticed respondent was carrying a gym bag that usually contained pornographic materials. Anna then told respondent that T.K. was home alone and respondent should go back to the house. After respondent dropped Anna off at her destination, Anna telephoned her son and told him to make sure that T.K. was upstairs when respondent arrived. Anna then called the police and informed them that respondent was on his way to her house.

Officer Thomas Hennigan testified he and his partner were assigned to investigate Anna’s allegations against respondent. On February 17, 1997, Anna called Hennigan and told him that respondent was on his way to her house to meet with T.K. En route to Anna’s house, Hennigan and his partner saw respondent drive past them in a white truck. The officers stopped respondent and arrested him. The officers searched respondent’s truck and recovered a gym bag containing 53 pornographic magazines and 3 pornographic video tapes. The officers also found a pair of handcuffs in the bag. A statement by the prosecutor during respondent’s commitment hearing indicates that the magazines depict “women” in a sexual context.

Detective Edward Winstead testified that he interviewed respondent at the police station on the day of his arrest. Respondent admitted he had written the letter Anna gave to the police. In the letter, respondent stated he wanted to either “massage” T.K. or simulate anal intercourse with her. Respondent said, when he wrote the letter, he had wanted to “rub against” T.K. while they looked at the magazines and watched the videos that were subsequently recovered from his truck. Respondent acknowledged that he had brought the magazines to Anna’s residence for that purpose. Respondent indicated that, when he drove to Anna’s house, he thought T.K. would be there alone; however, when respondent entered the house and saw T.K.’s older brother, respondent became alarmed and left. Notwithstanding the pursuit of procedures consistent with the stated intent of his letter and his discussions with Anna, respondent told Winstead, at one point in the interview, that he had changed his mind and did not intend to touch T.K. on that day. Respondent conceded he had not told Anna, or anyone else, that he had changed his mind. Moreover, he acknowledged that he wanted to perform the acts described in the letter.

The State presented the testimony of Drs. Henry and Shikari, both of whom testified that respondent was a pedophile and a sexually dangerous person. Dr. Henry testified he was employed as a forensic psychiatrist with the Office of Forensic Clinical Services and, in that capacity, he had evaluated more than 500 patients. In 1992, Henry received his license to practice medicine in Illinois. That year, he completed his residency at the University of Michigan’s department of psychiatry. In 1994, Henry became board certified in psychiatry. In 1996, he was certified in forensic psychiatry, and in 1998 he was certified in addiction psychiatry. Henry testified that he was a member of the American Academy of Psychiatry and the Law, the American Psychiatric Association, and the Illinois Psychiatric Society. He had previously qualified to testify as an expert in the field of forensic psychiatry.

Upon cross-examination, Henry conceded he had been asked to determine whether a person was sexually dangerous on “less than three” occasions. Respondent’s examination fell “somewhere between one and three.” Though he had assessed or diagnosed 50 pedophiles during his career, he had never treated any of those persons.

Based upon his limited examination of Henry, respondent’s attorney argued that Henry did not meet the statute’s requirements and thus was not a “qualified psychiatrist,” as defined in the SDPA. The SDPA defines a “qualified psychiatrist” as “a reputable physician licensed in Illinois to practice medicine in all its branches, who has specialized in the diagnosis and treatment of mental and nervous disorders for a period of not less than 5 years.” 725 ILCS 205/4.01 (West 2000). The circuit court ruled that Henry qualified to testify as an expert in the field of forensic psychiatry. The court noted that Henry had been licensed to practice medicine in 1992 and, based upon his education, training and experience, he qualified as an expert under the statute. Henry then proceeded to testify.

Prior to his interview with respondent, Henry reviewed records from Christ Hospital and the Chicago police department, as well as the letter respondent wrote to Anna. By the time he testified, Henry had also reviewed records from Avelante, a treatment program in which respondent had participated. Henry interviewed respondent on March 13, 1997. In the course of his interview with respondent, Henry and respondent discussed respondent’s activities up to the date of the examination. In essence, the discussion focused on three documented instances of sexual misconduct: one in 1983, another in 1984, and the final incident in 1997, which prompted the filing of the instant petition.

A police report revealed that, in 1983, respondent had fondled a 15-year-old girl after having threatened her with a screwdriver. Henry testified that respondent did not initially admit to the 1983 sexual assault. When Henry told respondent he was aware of the incident, respondent said he did not want to discuss it. He stated it had happened because he was mad. According to Henry, respondent eventually admitted that he had approached the girl with a screwdriver, had fondled her, and then had followed her into a school, where he was arrested. In a probation department report prepared prior to the commitment hearing, it is noted that respondent indicated he “was sentenced to psychiatric treatment” as a result of this incident. Henry testified that treatment took place at Christ Hospital.

Although Henry initially testified otherwise, under cross-examination Henry admitted respondent had provided 
no 
information regarding another incident that took place in 1984. Henry eventually conceded his information had come solely from “police reports.” Those reports evidently indicated respondent had developed a friendship with a 12-year-old girl and her brother for the apparent purpose of furthering his sexual objectives. On the date of the sexual assault, respondent allegedly sent the girl’s brother into a fast-food restaurant, then placed the girl on his lap, and looked at pornographic magazines with her while he fondled her vagina. According to Henry, respondent was “charged with a sexual offense” for his conduct with the girl. Respondent was 20 years old at the time. We note that the report prepared by the probation department indicates respondent had received a one-year conditional discharge on May 3, 1985, for criminal sexual abuse.

With respect to the 1997 incident involving 12-year-old T.K., respondent told Henry he was drunk when he wrote the letter to Anna K. and he did not intend to follow through with the activities described therein.

Henry described pedophilia as a major psychiatric illness characterized by repeated fantasies and activities involving sexual contact with children. Henry testified that the diagnosis requires a six-year age differential between perpetrator and victim. Henry stated that the disorder is reported to cause the afflicted person “distress and difficulty.” In fact, significant impairment or distress is required as part of the criteria for diagnosis. The disorder is chronic and lifelong, and is exacerbated by stress.

Henry observed that people who suffer from pedophilia tend to minimize or deny their pedophilic behavior. Henry noted that respondent denied or minimized his conduct when he discussed his sexual behavior. Respondent told Henry he had been ostracized by his family because of his sexual conduct. Respondent had developed a dependence on alcohol, and the incidents of pedophilia appeared to be linked to that dependence. According to Henry, respondent conveyed a sense of inadequacy and indicated that he felt incapable of having a mature relationship.

Henry testified that his examination of respondent revealed numerous “psychological stressors” in respondent’s life. Henry noted that respondent’s parents had recently died, respondent had been ostracized by his sister because of his activities, he had a very limited social support network, chronic financial difficulties, and a “somewhat modulized [
sic
] existence,” and he was unemployed and alcohol dependent. Henry indicated the presence of these stressors would increase respondent’s propensity to engage in “acting out” behavior that could include pedophilic activity.

Henry diagnosed respondent as a pedophile–utilizing the criteria set forth in the Diagnostic and Statistical Manual (DSM-IV) published by the American Psychiatric Association–and believed respondent to be a sexually dangerous person. His diagnosis of pedophilia was based upon respondent’s recurrent urges and fantasies involving children, which Henry believed had existed since at least 1983, though he admitted the 1983 incident could not be used to support a diagnosis of pedophilia because it did not meet the criteria for age differential. Henry testified that the three incidents, considered together, revealed a demonstrated propensity to engage in sexually assaultive behavior and “inappropriate criminal predatorial conduct directed toward children.” Henry felt that the risks respondent posed were enhanced by his minimization of his condition, alcohol dependency, and psychological stressors in his life.

The parties stipulated that Dr. Shikari was qualified to testify as an expert in forensic psychiatry. Shikari examined respondent on February 19, 1998. Shikari had reviewed police reports detailing various criminal offenses committed by respondent, the letter respondent had given to Anna  K., the prehearing report prepared by the probation department, Henry’s report, the petition filed by the State, and sexual offender treatment records from Christ Hospital and Adelante. Based on those records and his interview with respondent, Shikari believed that respondent could be classified as a sexually dangerous person.

When interviewed by Shikari, respondent was apparently more forthcoming about his sexual behavior than was the case with Henry. When Shikari asked respondent about the 1983 and 1984 incidents, respondent recounted the basic facts of each occurrence. Respondent said he was charged with aggravated criminal sexual assault as a result of his conduct with the young girl in 1984. He characterized his actions in each situation as “foolish and impulsive” and attempted to excuse his behavior by explaining that he was young at the time, had been drinking, and was under stress, financially strapped, and undergoing “hard times.” When asked about the incident involving T.K., respondent described the incident in detail and in much the same way that it was outlined in the police report. Respondent said he had been “setup.”

Like Henry, Shikari utilized the DSM-IV as a guideline for diagnosis. According to Shikari, the guidelines require that a person exhibit sexual desires, urges, or sexual behavior toward children that are recurrent and have lasted for at least six months. Shikari believed that the 1984 and 1997 incidents, taken together, established the first criterion for a diagnosis of pedophilia.

Another criterion for a diagnosis of pedophilia is a finding that the behavior causes significant distress or impairment to the person being diagnosed. Shikari found that respondent’s description of ostracism, as well as his financial difficulty and depression, met that criterion.

Shikari noted that there must also be an age disparity of at least five years between the perpetrator and the victim, and the victim must be prepubescent or sexually immature, in order to support a diagnosis of pedophilia. In respondent’s case, this was true of both the 1984 incident involving the 12-year-old girl and the current incident involving T.K.

According to Shikari, respondent’s behavior evinced a sexual attraction to children and a tendency to act upon that inclination when he was under stress and drinking. Shikari testified that, after considering respondent’s circumstances and all of the relevant criteria, he believed respondent to be a pedophile.

Shikari also found respondent to be a sexually dangerous person who had demonstrated a propensity toward sexual offenses and acts of sexual assault of children. He believed it was very likely that respondent would repeat sexual offenses against children in the future.

Based upon this evidence, the circuit court found respondent to be a sexually dangerous person. The court relied upon uncontroverted evidence regarding respondent’s attempt to commit an act of sexual abuse or assault on T.K. in February of 1997, and evidence of sexual conduct with a 12-year-old girl in 1984, as well as the testimony of the psychiatrists, indicating that respondent is a pedophile who has demonstrated his sexual propensities and will likely “continue to act upon his fantasies” due in part to various stress factors in his life. The trial court concluded the State had proven beyond a reasonable doubt that respondent is a sexually dangerous person.

Respondent’s motion to reconsider was heard on March 11 and 31, 1999, and was denied on the latter date. On April 1, 1999, respondent timely filed notice of appeal.

On appeal, respondent contended the State had failed to prove beyond a reasonable doubt that he had attempted an act of sexual assault or molestation or that he suffered from pedophilia. Respondent also argued that the trial court had erred in finding that one of the State’s psychiatrists was qualified to testify as an expert. Finally, respondent argued that the trial court’s finding did not warrant his confinement in a facility operated by the Illinois Department of Corrections.

The appellate court specifically rejected respondent’s arguments that the State was required to prove multiple acts of sexual assault or molestation, and that the proof of an attempted sexual offense with T.K. was a requisite to a finding of sexual dangerousness under the SDPA. The appellate court noted: “In this case, [respondent] does not dispute the 1984 conviction, and we find it sufficient to establish the ’demonstrated propensity’ element of the Act even in the absence of a finding that the underlying offense [involving T.K.] constitutes an attempted sexual assault.” Furthermore, the appellate court was not persuaded by respondent’s argument that the State was required to show his victims were “prepubescent” in order to prove he was a pedophile, suggesting that the sexual maturity of the victim was merely “a factor to be considered in diagnosing pedophilia.”

The appellate court also rejected respondent’s contention that Dr. Henry was not a “qualified psychiatrist” as defined in the SDPA, relying upon 
People v. Bommersbach
, 228 Ill. App. 3d 877, 882 (1992) (holding that years of psychiatric residency, prior to board certification as a psychiatrist, may be considered in assessing whether the psychiatrist meets the statute’s five-year requirement).

Finally, addressing respondent’s contention that the finding of sexual dangerousness by the trial court did not mandate respondent’s confinement in the Department of Corrections, the appellate court pointed out that the trial court had “committed [respondent] to the Director of the IDOC as guardian.” Quoting section 8 of the Act (725 ILCS 205/8 (West 1998)), the appellate court noted that disposition is consistent with the statutory directive: “ ‘If the respondent is found to be a sexually dangerous person then the court shall appoint the Director of Corrections guardian of the person found to be sexually dangerous and such person shall stand committed to the custody of such guardian.’ ” Citing 
People v. Oetgen
, 269 Ill. App. 3d 1000, 1006 (1995), the court noted that the Director is given the discretion to determine what treatment a sexually dangerous person requires and where he or she should be placed, be it in a facility of the Department of Corrections or another setting.

ANALYSIS

 We first address the central question raised by respondent in this case: whether respondent’s commitment as a sexually dangerous person comports with principles of substantive due process loosely articulated in the United States Supreme Court’s decisions in
 Kansas v. Hendricks
, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), and 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002). Respondent did not raise an issue of constitutional dimension in the appellate court. The 
Crane 
decision was rendered after the appellate court’s disposition in this case, and it is upon 
Crane 
that respondent principally bases his constitutional contentions.

Initially, respondent argues that his commitment under the SDPA should be reversed because “the evidence was insufficient to satisfy constitutional requirement[s]” set forth in 
Hendricks 
and 
Crane. 
Later, in his reply brief, he suggests that “the SDPA is constitutionally infirm if it is interpreted as not requiring a separate lack of control finding.” Citing 
People v. Coleman
, 183 Ill. 2d 366, 384-85 (1998), respondent submits that the question presented involves a “legal interpretation” of 
Crane 
requiring 
de novo 
review. The State approaches respondent’s argument from the outset as a challenge to the constitutionality of the SDPA and, citing our opinion in 
People v. Malchow
, 193 Ill. 2d 413, 418 (2000), observes that “the standard of review of the constitutionality of a statute is 
de novo
.” We agree that 
de novo 
review is appropriate.

We note that statutes are presumed constitutional, and the party challenging the validity of a statute has the burden of clearly establishing that it is unconstitutional. 
In re Curtis B.
, 203 Ill. 2d 53, 58 (2002). Since statutes enjoy a strong presumption of constitutionality, courts must construe statutes in order to uphold their constitutionality whenever reasonably possible. 
Hill v. Cowan
, 202 Ill. 2d 151, 157 (2002).

With these principles in mind, we begin our analysis by examining the language of the SDPA, pursuant to which respondent’s commitment was ordered. Section 1.01 of the SDPA defines the term “sexually dangerous persons” as follows:

“All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***.” 725 ILCS 205/0.01
 
(West 1998).

Thus, commitment under the SDPA requires that the State convince the trier of fact–whether judge or jury (725 ILCS 205/5 (West 1998))–beyond a reasonable doubt (725 ILCS 205/3.01 (West 1998)) that the person who is the subject of the proceeding has a “mental disorder” of the prescribed duration, that the mental disorder is associated with criminal propensities to the commission of sex offenses, and that the person has actually demonstrated that propensity.

Unlike Illinois’ Sexually Violent Persons Commitment Act (SVPA
(footnote: 1)) (725 ILCS 207/1 
et seq.
 (West 2000)), the SDPA does not define the term “mental disorder.” The SVPA defines “mental disorder” as “a congenital or acquired condition affecting the emotional or 
volitional capacity
 that predisposes a person to engage in acts of sexual violence.” (Emphasis added.) 725 ILCS 207/5(b) (West 2000). Unlike the SVPA, the SDPA does not 
specifically
 address the probability or likelihood that the subject of the proceeding will engage in sexual offenses in the future. Before a person may be committed under the SVPA, the trier of fact must find that the subject of the proceeding “is dangerous because he or she suffers from a mental disorder that makes it 
substantially probable
 that the person will engage in acts of sexual violence.” (Emphasis added.) 725 ILCS 207/5(f) (West 2000).

In 
Hendricks 
and 
Crane
, the Supreme Court addressed the constitutionality of a Kansas statute which was very similar to Illinois’ SVPA. The Kansas Sexually Violent Predator Act (Kan. Stat. Ann. §59–29a01 
et seq. 
(1994)) provided for commitment of persons who, due to a “mental abnormality” or “personality disorder,” were “
likely
 to engage in predatory acts of sexual violence.” (Emphasis added.) Kan. Stat. Ann. §59–29a02(a) (1994). The statute defined “mental abnormality” as a “congenital or acquired condition affecting the emotional or
 volitional capacity
 which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.” (Emphasis added.) Kan. Stat. Ann. §59–29a02(b) (1994).

In 1996, the Kansas Supreme Court invalidated Kansas’ SVPA, holding that its precommitment condition of a “mental abnormality” did not satisfy what the court believed to be the substantive due process requirement that involuntary civil commitment must be predicated on a finding of “mental illness.” 
In re Hendricks
, 259 Kan. 246, 261, 912 P.2d 129, 138 (1996).

The United States Supreme Court subsequently reversed the judgment of the Kansas Supreme Court, holding that the statutory definition of “mental abnormality” satisfied substantive due process requirements. 
Hendricks
, 521 U.S. at 356, 138 L. Ed. 2d at 511, 117 S. Ct. at 2079. The Court noted that states have “in certain narrow circumstances” provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety, and the Court had “consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards.” 
Hendricks
, 521 U.S. at 357, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080. The Court observed that the Kansas statute required that the mental abnormality make the person “likely to engage in predatory acts of sexual violence.” The Court stated, “The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated.” 
Hendricks
, 521 U.S. at 357-58, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080. The Court noted it had previously sustained civil commitment statutes when they had coupled proof of dangerousness with proof of some additional factor, such as “mental illness” or “mental abnormality,” referring, 
inter alia
, to our own SDPA and the Court’s decision in 
Allen v. Illinois
, 478 U.S. 364, 365-66, 92 L. Ed. 2d 296, 302, 106 S. Ct. 2988, 2990 (1986). The Court stated, “These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.” 
Hendricks
, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080. Later in the opinion, during a discussion of double jeopardy and 
ex post facto 
issues, the Court again emphasized the importance of evidence of prior criminal conduct for purposes of demonstrating the existence of a “mental abnormality” and to “support a finding of future dangerousness.” 
Hendricks
, 521 U.S. at 362, 138 L. Ed. 2d at 515, 117 S. Ct. at 2082.

We note in passing that the operative term in our SDPA is “mental disorder,” not “mental illness,” as the Court states in 
Hendricks. 
Moreover, in 
Allen, 
the Supreme Court decided only that proceedings held pursuant to our SDPA were civil in nature, rather than criminal, and thus the federal constitutional privilege against self-incrimination did not apply in such proceedings. The suggestion that the Court addressed an issue remotely similar to the one before the Court in 
Hendricks 
is baseless.

Four years after its decision in 
Hendricks
, the United States Supreme Court again had occasion to address Kansas’ SVPA in 
Crane
. In 
Crane
, the Court held that the Kansas Supreme Court had misinterpreted 
Hendricks
 insofar as the Kansas court had read 
Hendricks 
as requiring “total or complete lack of control” for purposes of civil commitment. (Emphasis omitted.) 
Crane
, 534 U.S. at 411, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. The Court observed that “an absolutist approach is unworkable.” 
Crane
, 534 U.S. at 411, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.

According to the Court, 
Hendricks 
“underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment ‘from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.’ 521 U.S., at 360. *** The presence of what the ‘psychiatric profession itself classifie[d] ... as a serious mental disorder’ helped to make that distinction in 
Hendricks
. And a critical distinguishing feature of that ‘serious ... disorder’ there consisted of a special and serious lack of ability to control behavior.” 
Crane
, 534 U.S. at 412-13, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.

Although the foregoing passage suggests that Hendricks’ diagnosis of pedophilia itself may have sufficed to establish “serious difficulty controlling behavior”–the volitional standard for commitment that emerges from 
Crane
–the
 Crane 
Court’s earlier summary of the 
Hendricks 
decision casts doubt on that characterization. The 
Crane 
Court had previously noted that the decision in 
Hendricks
 was premised on three bases: (1) Hendricks suffered from pedophilia, (2) the psychiatric profession itself classified that condition as a serious mental disorder, and (3) Hendricks conceded he could not “control the urge” to molest children. 
Crane
, 534 U.S. at 410, 151 L. Ed. 2d at 861, 122 S. Ct. at 869. In 
Crane
, the Court noted 
Hendricks
’ conclusion that it was Hendricks’ “ ‘admitted lack of volitional control, coupled with a prediction of future dangerousness, [that] adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.’ ” 
Crane
, 534 U.S. at 410, 151 L. Ed. 2d at 861, 122 S. Ct. at 869, quoting 
Hendricks
, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct. at 2081. Although it is not entirely clear, it 
appears
 that Hendricks’ concession may have been a significant feature of the decision in 
Hendricks
, and the 
Crane 
Court recognized it as such. The majority opinion in 
Crane 
suggests that it provides constitutional guidance “by proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require.” 
Crane
, 534 U.S. at 414, 151 L. Ed. 2d at 863, 122 S. Ct. at 871.

Justice Scalia dissented in 
Crane
, joined by the author of
 
the majority opinion in 
Hendricks
, Justice Thomas. The dissenters in 
Crane 
criticized the majority for requiring a “separate ‘lack-of-control determination’ ” and for “reopen[ing] a question closed by 
Hendricks
: whether the SVPA also cannot be applied as written because it allows for the commitment of people who have mental illnesses other than volitional impairments.” 
Crane
, 534 U.S. at 421, 151 L. Ed. 2d at 868, 122 S. Ct. at 874-75 (Scalia, J., dissenting, joined by Thomas, J.). The dissenters opined that the “distinctive status of volitional impairment *** mangles 
Hendricks
,” and they argued that, for “good reason,” the Court had not formerly distinguished, for constitutional purposes, between volitional, emotional, and cognitive impairments: “It is obvious that a person may be able to exercise volition and yet be unfit to turn loose upon society. The man who has a will of steel, but who delusionally believes that every woman he meets is inviting crude sexual advances, is surely a dangerous sexual predator.” 
Crane
, 534 U.S. at 422, 151 L. Ed. 2d at 868-69, 122 S. Ct. at 875 (Scalia, J., dissenting, joined by Thomas, J.). Justice Scalia read the Court’s decision in 
Hendricks 
as holding that “the very existence of a mental abnormality or personality disorder that causes a likelihood of repeat sexual violence 
in itself
 establishes the requisite ‘difficulty if not impossibility’ of control.” (Emphasis added and emphases omitted.) 
Crane
, 534 U.S. at 419-20, 151 L. Ed. 2d at 867, 122 S. Ct. at 874 (Scalia, J., dissenting, joined by Thomas, J.).

Finally, Justice Scalia rejected the majority’s assertion that its approach–“ ‘proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require’ ”–provided meaningful constitutional guidance. He responded: “[O]ne would think that this plan would at least produce the ‘elaboration’ of what the jury charge should be in the ‘specific circumstances’ of the present case. ‘[P]roceeding deliberately’ is not synonymous with not proceeding at all. I suspect that the reason the Court avoids any elaboration is that elaboration which passes the laugh test is impossible.” 
Crane
, 534 U.S. at 423, 151 L. Ed. 2d at 869, 122 S. Ct. at 876 (Scalia, J., dissenting, joined by Thomas, J.). The dissenters in 
Crane 
described the majority opinion as “gutting *** [the] holding in 
Hendricks
” and charged that it had substituted a “new constitutional test.” 
Crane
, 534 U.S. at 422, 151 L. Ed. 2d at 869, 122 S. Ct. at 875 (Scalia, J., dissenting, joined by Thomas, J.).

Clearly, the justices of the 
Crane
 majority 
did not believe their decision called into question the continued viability of 
Hendricks. 
Nothing said in the majority opinion 
explicitly
 repudiates or alters principles espoused in 
Hendricks
.

Nonetheless, in the aftermath of 
Hendricks 
and 
Crane, 
state courts have struggled with the “generally stated constitutional standards” enunciated therein as they reexamine their own civil commitment statutes for compliance with those decisions. As in the instant case, the principal point of contention concerns the holding of 
Crane
, specifically, whether 
Crane
 requires a separate lack-of-control determination couched in terms of “serious difficulty controlling behavior.”

In 
Westerheide v. State
, 831 So. 2d 93 (Fla. 2002), 
In re Commitment of Laxton
, 254 Wis. 2d 185, 647 N.W.2d 784 (2002), and 
In re Luckabaugh
, 351 S.C. 122, 568 S.E.2d 338 (2002), the supreme courts of Florida, Wisconsin, and South Carolina considered state sexually violent offender acts which, like our own SVPA, require proof of the commission of a prior offense, and include specific definitions of “mental abnormality” or “mental disorder,” as well as a defined burden regarding the likelihood of future offenses, all important considerations in the 
Hendricks 
and 
Crane
 analyses.

The Florida act defined a sexually violent predator as a person who had been convicted of a sexually violent offense 
and
 who suffered from a mental abnormality or personality disorder that made the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment. See Fla. Stat. §394.912(10) (2001). The statute defined “mental abnormality” as “a mental condition affecting a person’s emotional or volitional capacity which predisposes the person to commit sexually violent offenses.” Fla. Stat.  §394.912(5) (2001). The Florida Supreme Court held that these terms supplied the elements constitutionally required for civil commitment, and a jury properly instructed with definitions of these and other pertinent statutory terms need not receive additional instructions specifically stating that the person to be committed must experience “serious difficulty” controlling his or her behavior. 
Westerheide
, 831 So. 2d at 108-09. Accord 
Laxton
, 254 Wis. 2d at 201-07, 647 N.W. 2d at 793-95 (instructions given were adequate in that they tracked statutory definition of terms “mental disorder” and “sexually violent person”).

South Carolina’s SVPA (S.C. Code Ann. §§44–48–10 to 44–48–170 (2002)) defines a “sexually violent predator” as a person who has been convicted of a sexually violent offense and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment. S.C. Code Ann. §§44–48–30(1)(a), (1)(b) (2002). The act defines the phrase “[l]ikely to engage in acts of sexual violence” to mean “the person’s propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others.” S.C. Code Ann. §44–48–30(9) (2002). In 
Luckabaugh
, the South Carolina Supreme Court considered the act’s requirements and found them to be “the functional equivalent of the requirement in 
Crane.
”
 Luckabaugh
, 351 S.C. at 144, 568 S.E.2d at 349. The court found that a lack-of-control determination was inherent within the mental abnormality prong of the act.
 Luckabaugh
, 351 S.C. at 144, 568 S.E.2d at 349.

In
 Commonwealth v. Boucher
, 438 Mass. 274, 780 N.E.2d 47 (2002), the Supreme Court of Massachusetts held that state’s SVPA comported with principles expressed in 
Hendricks 
and 
Crane
. 
Boucher
, 438 Mass. at 277-78, 780 N.E.2d at 50. The Massachusetts statute defined a sexually dangerous person as a “person who has been *** convicted *** of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person 
likely
 to engage in sexual offenses if not confined to a secure facility.” (Emphasis added.) 
Boucher
, 438 Mass. at 275, 780 N.E.2d at 48.

Although we are aware of 
no 
state supreme court decision to date which invalidates a sexual offender commitment act on the basis of 
Crane
, three state high courts 
have
 ordered further proceedings in SVPA cases to ensure compliance with 
Crane
, and the Arizona Supreme Court has formulated an instruction tracking the pertinent language of 
Crane
 and has ordered its use in future cases. See 
In re Leon
, 204 Ariz. 15, ___, 59 P.3d 779, 787 (2002). The supreme courts of Iowa, Missouri and New Jersey have actually remanded cases for further proceedings where the triers of fact were either not instructed that the proper volitional standard for commitment under the acts entailed “serious difficulty” controlling behavior (
In re Detention of Barnes
, 658 N.W.2d 98, 101 (Iowa 2003);
 Thomas v. State
, 74 S.W.3d 789 (2002)), or the finding for commitment was not couched in those terms (
In re Commitment of W.Z.
, 173 N.J. 109, 133-34, 801 A.2d 205, 219 (2002)).

We take particular notice of the approach taken by the New Jersey Supreme Court in 
Commitment of W.Z.
, wherein that court stated:

“Clearly the Legislature intended that there be a ‘loss of control’ requirement in the SVPA. 
*** 
Pursuant to our doctrine of avoiding constructions of our statutes that raise constitutional doubts about their validity, the SVPA must be applied in a manner that satisfies the [Supreme] Court’s characterization of the required loss of control. We infer from the Act as a whole a legislative intent to act constitutionally
 
and to apply a standard that would accord with the [
Crane
] Court’s ‘serious difficulty’ with control over dangerous sexual behavior standard in order for a sex offender to be subject to involuntary commitment.” 
Commitment of W.Z.
, 173 N.J. at 128, 801 A.2d at 216.

The court noted that the New Jersey SVPA, though “worded differently,” suggested an analysis similar to that expressed in 
Hendricks 
and 
Crane
. 
Commitment of W.Z.
, 173 N.J. at 130, 801 A.2d at 217. The court concluded:

“The SVPA is not violative of substantive due process provided that the 
findings
 to support an individual’s civil commitment under the Act comport with the requirements of this opinion. We remand this matter to the trial court for further proceedings in light of the additional requirement that to support involuntary commitment of a sex offender under the SVPA, the State must prove *** that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend. Because that standard had not been expressed by the Supreme Court in 
Crane
, or by us, at the time of W.Z.’s commitment hearing, we must remand to the trial court for a determination of whether W.Z.’s mental condition causes the required degree of inability to control sexually violent behavior to justify his commitment under the SVPA.” (Emphasis added.) 
Commitment of W.Z.
, 173 N.J. at 133, 801 A.2d at 219.

Illinois’ SDPA contains neither a definition of “mental disorder” that specifically links the disorder to impairment of “volitional capacity” nor a specific standard for determining the likelihood that a sexual offense will be committed in the future. Illinois’ SVPA, like those of other states, 
does 
contain an articulated volitional component in its definition of “mental disorder” and a required finding that it is “substantially probable” the subject of the proceeding will engage in proscribed sexual conduct in the future. 725 ILCS 207/5(f) (West 2000).

We believe that section 1.01 of the Illinois SDPA (725 ILCS 205/1.01 (West 2000)), in its current form, meets minimal constitutional standards as expressed in 
Hendricks. 
The language of the SDPA implies that the mental disorder which afflicts the subject of the commitment proceeding must be causally related to the person’s propensity to commit sex offenses, and the requirement that the person has 
demonstrated 
that propensity by his or her actions is an important indicator of 
both 
mental abnormality or disorder and future dangerousness, as 
Hendricks 
acknowledged. See 
Hendricks
, 521 U.S. at 362, 138 L. Ed. 2d at 515, 117 S. Ct. at 2082. By acting upon their propensities, those suffering from mental disorders demonstrate dangerousness and impaired volitional capacity. Dangerousness and lack of control are the touchstones for civil commitment under 
Hendricks.

However, in holding that the SDPA meets minimal constitutional requirements under the 
Hendricks 
analysis, we are not saying that the statute is without certain significant ambiguities that impact its compliance with the Court’s most recent pronouncement in 
Crane
. In particular, we note that the SDPA, unlike similar statutes in other states and our own SVPA, does not 
specifically
 address volitional capacity, it fails to define the term “mental disorder” and it does not provide an explicit standard for gauging the probability or likelihood that the subject of the proceeding will commit sexual offenses in the future.

When a statute is unclear, a court may look to similar statutes as an aid to construction. 
Mowen v. Holland
, 336 Ill. App. 3d 368, 374 (2003). It is presumed that statutes relating to the same subject are governed by one spirit and a single policy. 
Mowen
, 336 Ill. App. 3d at 374. Illinois’ SDPA and SVPA are obviously closely related in subject and proximity, and they are undoubtedly governed by one spirit and a single policy. Therefore, we believe it is merely a matter of legislative oversight that the SDPA has not been amended to make its terminology consistent with the SVPA. When the intent of the legislature is otherwise clear, the judiciary possesses the authority to read language into a statute which has been omitted through legislative oversight. 
Collins v. Board of Trustees of the Firemen’s Annuity & Benefit Fund
, 155 Ill. 2d 103, 112 (1993); 
People v. Shephard
, 152 Ill. 2d 489, 498 (1992); see also 
People v. Schaefer
, 274 Ill. App. 3d 450, 452 (1995).

In accordance with that authority, we believe the SVPA’s definition of “mental disorder” should be read into the SDPA to the extent consistency allows and augmented with the standard that appears to emerge from 
Crane
. Thus, we construe the term “mental disorder,” as used in the SDPA, to mean a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in the commission of sex offenses and results in serious difficulty controlling sexual behavior.

Moreover, as in 
People v. Pembrock
, 62 Ill. 2d 317, 320-21 (1976) (holding that commitment under the SDPA required proof beyond a reasonable doubt, rather than by a preponderance of the evidence), we deem it appropriate, at this juncture, to also clarify the standard by which dangerousness shall be judged and commitment ordered. Again, consistency dictates utilization of the standard set forth in the SVPA (725 ILCS 207/5(f) (West 2000)), thus making explicit what, perhaps, has been heretofore implicit. Thus, a finding of sexual dangerousness premised upon the elements of section 1.01 of the SDPA (725 ILCS 205/1.01 (West 2000)) must hereafter be accompanied by an explicit finding that it is “substantially probable” the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined.

We believe the standards announced in this opinion will ensure compliance with the Supreme Court’s decision in 
Crane
, which was announced after the commitment proceedings in this case, and clarify the state criteria for civil commitment hitherto in use. Because these standards had not been expressed by the Supreme Court, or this court, at the time of respondent’s commitment hearing, we deem it necessary to remand this cause to the circuit court for a new hearing wherein the parties will have a full and fair opportunity to adduce evidence pertinent to the applicable standards herein announced. See 
In re Enis
, 121 Ill. 2d 124, 133-34 (1988) (ordering a new hearing on the State’s petition to terminate parental rights, to be conducted under the constitutionally proper standard, where the trial court had judged the evidence by the improper standard of proof);
 Pembrock
, 62 Ill. 2d at 321 (remand for new commitment hearing under the SDPA utilizing proper standard of proof); 
Commitment of W.Z.
, 173 N.J. at 133, 801 A.2d at 219 (remand for additional findings consistent with 
Crane
). 

Given our disposition of this matter, we need not address respondent’s other issues. We do, however, note that the evidence adduced at the original commitment hearing 
was 
constitutionally sufficient to justify commitment under standards then existing.

The judgments of the circuit and appellate courts are reversed and the cause remanded to the circuit court for proceedings consistent with this opinion.

Judgments reversed;

cause remanded.

FOOTNOTES
1:     
1
Although the proper acronym for this state’s act would be “SVPCA,” we will use “SVPA” because of the prevalence of substantially similar statutes known by that acronym throughout the country.