# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Masterson*, 2011 IL 110072

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES MASTERSON, Appellant. |
| Docket No. | 110072 |
| Filed | September 22, 2011 |
| Rehearing denied | November 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Persons sought to be statutorily committed as sexually dangerous and as sexually violent are not similarly situated, and the fact that only the latter may retain their own experts at public expense does not deny equal protection. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Bruce Charles Landrum, Assistant Public Defender, of counsel), for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

Justices

CHIEF JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1     The issue in this appeal is whether the provisions of the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq*. (West 1998)) addressing the selection of evaluating psychiatrists violate the equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV). Specifically, respondent, James Masterson, asserts that the provisions deny his right to equal protection by failing to provide him with the option to retain an independent psychiatrist to defend against commitment proceedings, an option afforded similarly situated individuals subject to commitment proceedings under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2000)). The circuit court of Cook County rejected respondent's argument, ultimately declaring him a sexually dangerous person and ordering his commitment. The appellate court affirmed. No. 1-05-3945 (unpublished order under Supreme Court Rule 23). For the following reasons, we affirm the appellate court's judgment.

¶ 2                                I. BACKGROUND

¶ 3     This is the second time that this court has considered respondent's case after his involuntary commitment as a sexually dangerous person. On the first occasion, we reversed the judgments of the lower courts and remanded for a new commitment hearing using standards for civil commitment consistent with the United States Supreme Court's decisions in *Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Kansas v. Crane*, 534 U.S. 407 (2002). *People v. Masterson*, 207 Ill. 2d 305 (2003) (*Masterson I*).

¶ 4     On remand, in relevant part, the circuit court appointed two psychiatrists to evaluate respondent, and both found respondent to be a sexually dangerous person. Respondent filed a motion to retain a third independent psychiatrist. Following a hearing, the circuit court

-2-

rejected respondent's request, finding that its appointment of two psychiatrists to evaluate respondent complied with the applicable statutory requirements. When respondent renewed his motion for an "independent evaluation," the court again denied his request for a third psychiatrist.

¶ 5    At the subsequent hearing on the State's commitment petition, the following evidence was presented. In 1997, respondent regularly paid Anna K. money to engage in sexual acts with him. In February 1997, respondent gave Anna a letter indicating that he wanted to view pornographic material and have intimate contact with Anna's 12-year-old daughter in exchange for money. Anna was upset by the letter, and her son convinced her to inform law enforcement officials. After consulting with police officers, Anna agreed to participate in a police operation to make respondent believe that he could meet her minor daughter.

¶ 6    Anna and respondent scheduled the meeting for February 18, 1997, at Anna's house. Prior to the arranged meeting, respondent encountered Anna on the street and picked her up, driving his vehicle to her house. Anna saw respondent's black gym bag inside his vehicle. The bag contained pornographic magazines and videotapes, items that Anna recognized from her previous encounters with respondent. After they arrived at Anna's home, Anna went inside while respondent waited in his vehicle. Anna told her son to take her daughter upstairs and then Anna left the house, asking respondent to drive her to another location. Respondent complied. After respondent dropped Anna off, Anna called her son, who had stayed at home with her daughter, and also called police officers to report that respondent was going to her house.

¶ 7    Ultimately, Chicago police officers Thomas Hennigan and James Volpi stopped respondent's vehicle a short distance from Anna's house. Officers recovered a dark-colored gym bag from respondent's vehicle. The bag contained 53 pornographic magazines, two or three videotapes, and handcuffs. Respondent was in possession of $504 at the time of his arrest.

¶ 8    Respondent was taken to the police station, where he agreed to talk to police detectives after being advised of his constitutional rights. Respondent admitted that he gave Anna the letter indicating his desire to view pornographic material and to have intimate contact with her minor daughter. Respondent acknowledged that he occasionally paid Anna for sex. Respondent told detectives that after he dropped Anna off, he believed her daughter was home alone at Anna's house. Respondent discovered, however, that Anna's son was also at the house, and respondent left. Respondent was then stopped by police officers.

¶ 9    Two court-appointed expert forensic psychiatrists, Dr. Stafford Henry and Dr. Carol Flippen, evaluated respondent. In addition to personal evaluations, the doctors reviewed respondent's relevant medical and court records. Dr. Henry and Dr. Flippen each reached the same medical opinion of respondent, specifically, that he suffered from the mental disorder pedophilia.

¶ 10    During their respective evaluations of respondent, Dr. Henry and Dr. Flippen discussed with him the underlying 1997 incident. Respondent admitted that he routinely paid Anna to

perform sex acts and to view pornographic material. Respondent also admitted that he wrote Anna a letter expressing his desire to have sexual contact with her minor daughter. Respondent planned to have the girl sit on his lap while they watched pornographic material. Respondent told Dr. Henry that he wanted to rub his penis against the girl's anus. Respondent told Dr. Flippen that he planned to rub or massage the girl's vaginal area through her clothing. When asked what would have happened if respondent found Anna's minor daughter alone at the house, respondent replied that he was "not sure," but that he "might have assaulted her."

¶ 11    Respondent also discussed two other relevant incidents. In 1983, after being fired from his job, respondent was angry and driving his vehicle when he saw a young girl walking alone. Respondent felt the girl was dressed provocatively because she was wearing shorts. Respondent felt aroused by the girl and asked her if she needed a ride. The girl refused, and respondent drove away. Respondent stopped his vehicle a short distance away and waited for the girl. When the girl reached his location, respondent threatened her with a screwdriver and groped her. The girl escaped and ran to her school. Respondent followed her to the school and was arrested there.

¶ 12    A year later, in 1984, respondent befriended a 12-year-old girl and her 14- or 15-year-old brother by purchasing them gifts, with the intention of eventually being alone with the girl. Respondent took the girl and her brother to a restaurant and sent the brother inside to purchase food. The girl remained alone with respondent inside his vehicle. While they were alone, respondent looked at pornographic magazines with the girl. When the brother returned, respondent directed him to a nearby flea market. Alone again with the girl, respondent made her lay on her back while he touched her vagina.

¶ 13    Respondent also discussed his sexual history with his evaluating psychiatrists. Respondent had his first sexual contact at the age of 11 or 12 years. Beginning at the age of 16 years, respondent regularly used the services of prostitutes, estimating that he had been with between 75 and 100 prostitutes. Respondent masturbated publicly and had been arrested for indecent exposure on at least two occasions. Respondent possessed thousands of pornographic magazines but did not own pedophilic pornography because it was too expensive. Respondent also owned between 30 and 50 pornographic videotapes. Respondent explained his possession of pornography as "fodder for his fantasies."

¶ 14    Respondent consumed alcohol on a daily basis and described his use as excessive and problematic. Respondent believed himself to be a "sex offender," specifically a pedophile. When asked to explain, respondent told Dr. Henry that he was sexually attracted to younger girls. Respondent told Dr. Flippen that he was attracted to young girls because they would not say no to him because he was an adult and he could control them.

¶ 15    Respondent received mental health evaluations from doctors at Big Muddy Correctional Center in September 2003 and February 2004. In those evaluations, respondent acknowledged that he was a sexually dangerous person and indicated that he believed if he were released he would again drink alcohol and view pornographic material and likely commit new offenses. Respondent self-reported a total of 10 female victims, 6 of them young

girls. Although respondent initially participated in mental health treatment at Big Muddy Correctional Center, he later declined treatment. Risk assessments indicated that respondent had a high probability of committing future offenses.

¶ 16    Based on his evaluation of respondent and respondent's background, Dr. Henry opined, to a reasonable degree of medical and psychiatric certainty, that respondent suffered from a major psychiatric condition affecting his emotional and volitional capacity and predisposing him to engage in sexually deviant conduct and difficulty with controlling his sexual urges, namely, pedophilia. Dr. Henry concluded that respondent was at significant risk to engage in future acts of sexually deviant behavior. Similarly, Dr. Flippen testified that, in her medical opinion, respondent suffered from pedophilia since 1983, was a sexually dangerous person, and would commit additional offenses if not confined.

¶ 17    The State rested its case following the testimony of Dr. Henry and Dr. Flippen. Respondent did not present any additional evidence.

¶ 18    Following closing arguments, the trial court found that the State proved beyond a reasonable doubt that respondent was a sexually dangerous person. Specifically, the court found that: (1) respondent suffered from a mental disorder, namely, pedophilia, since 1983; (2) the disorder is causally related to his propensity to engage in a sex offense; (3) respondent has serious difficulty controlling his behavior; and (4) a substantial probability exists that respondent would commit sex offenses if not confined. The court ordered respondent confined until he was recovered within the meaning of the statute, appointed the Director of Corrections as respondent's guardian, and directed that respondent receive treatment for his disorder to effect his recovery.

¶ 19    The appellate court affirmed. The court, in pertinent part, rejected respondent's contention that he was entitled to the appointment of a third expert of his choosing. No. 1-05-3945 (unpublished order under Supreme Court Rule 23).

¶ 20    This court allowed respondent's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)).

¶ 21                                II. ANALYSIS

¶ 22    On appeal, respondent argues that he was denied his constitutional right to equal protection when the trial court refused to allow him to retain his own mental health expert, at the public's expense, while defending against his commitment under the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/0.01 *et seq.* (West 1998)), an option afforded to similarly situated individuals facing commitment under the Sexually Violent Persons Commitment Act (SVPA) (725 ILCS 207/1 *et seq.* (West 2000)). Citing our decision in *Masterson I*, respondent contends that because this court held that the definition of "mental disorder" in the SDPA is identical to the definition of that term in the SVPA, there is no rational basis to treat individuals charged under the SDPA any differently than those charged under the SVPA. Respondent further contends that he, as a person committed under the

SDPA, is similarly situated to individuals committed under the SVPA because they all face the potential of indefinite involuntary commitment as a result of their respective mental disorders.

¶ 23    We review *de novo* a constitutional challenge to a statute because it presents a question of law. *People v. Molnar*, 222 Ill. 2d 495, 508 (2006). Legislative enactments have a strong presumption of constitutionality, and this court is required to uphold the constitutionality of a statute whenever reasonably possible. *People v. Alcozer*, 241 Ill. 2d 248, 259 (2011). The party challenging the constitutionality of the statute has the burden to prove its invalidity. *Alcozer*, 241 Ill. 2d at 259.

¶ 24    The equal protection clause requires that the government treat similarly situated individuals in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently. *People v. Ramsey*, 239 Ill. 2d 342, 409 (2010). The applicable level of scrutiny applied to an equal protection challenge is determined by the nature of the right impacted. *Alcozer*, 241 Ill. 2d at 262. Strict scrutiny analysis applies when a fundamental right or suspect classification based on race or national origin is involved, and requires a showing that the statute is narrowly tailored to serve a compelling state interest. *Alcozer*, 241 Ill. 2d at 262. When a recognized fundamental right or suspect classification is not implicated, this court applies the rational basis standard, requiring us to determine whether the statute bears a rational relationship to a legitimate government purpose. *Alcozer*, 241 Ill. 2d at 262; see also *In re Detention of Samuelson*, 189 Ill. 2d 548, 562 (2000) (applying rational basis standard to equal protection challenge to SVPA); *People v. Pembrock*, 62 Ill. 2d 317, 322 (1976) (applying rational basis standard to equal protection challenge to SDPA). Finally, a third level of scrutiny, intermediate between strict scrutiny and the rational basis standard, applies to classifications based on gender, illegitimacy, and content-neutral incidental burdens to speech. *Alcozer*, 241 Ill. 2d at 262-63. Intermediate scrutiny requires a showing that the statute is substantially related to an important governmental interest. *Alcozer*, 241 Ill. 2d at 263.

¶ 25    As a threshold matter, though, it is axiomatic that an equal protection claim requires a showing that the individual raising it is similarly situated to the comparison group. *People v. Whitfield*, 228 Ill. 2d 502, 513 (2007). In fact, when a party fails to make that showing, his equal protection challenge fails. *Whitfield*, 228 Ill. 2d at 513. Typically, in the context of equal protection claims, a determination that individuals are similarly situated requires an analysis of the purpose of the legislation at issue. *People v. Warren*, 173 Ill. 2d 348, 363 (1996). In this case, the statutory schemes at issue are the SDPA and the SVPA.

¶ 26    The SDPA, in existence in some form since 1938, expanded the common law rule that insane persons could not be held culpable for their crimes "to include persons who were not insane but were suffering from a mental disorder described in the [SDPA]." *People v. Spurlock*, 388 Ill. App. 3d 365, 373 (2009) (citing *People v. Redlich*, 402 Ill. 270 (1949)); 725 ILCS 205/0.01 (West 1998). Consequently, an SDPA proceeding does not determine a respondent's guilt or innocence. *Spurlock*, 388 Ill. App. 3d at 373.

¶ 27    Instead, the SDPA permits the State to seek an involuntary and indefinite commitment

in lieu of criminal prosecution when a person believed to be sexually dangerous is charged with a criminal offense. *People v. Lawton*, 212 Ill. 2d 285, 288 (2004). Notably, the pending criminal charge underlying the SDPA petition need not be a sex-related offense. See 725 ILCS 205/3 (West 1998) (requiring only a pending criminal charge as a prerequisite to filing an SDPA petition).

¶ 28　　Although SDPA proceedings are civil in nature (725 ILCS 205/3.01 (West 1998)), the State must prove sexual dangerousness beyond a reasonable doubt (725 ILCS 205/3.01 (West 1998)). The individual facing commitment is also entitled to counsel and a jury trial. 725 ILCS 205/5 (West 1998). The SDPA defines sexually dangerous persons, in relevant part, as:

> "All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***." 725 ILCS 205/1.01 (West 1998).

Consistent with this court's holding in *Masterson I*, the term "mental disorder" in the SDPA is defined the same as in the SVPA, namely, "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2008); see *Masterson I*, 207 Ill. 2d 305, and Pub. Act 94-705 (eff. June 1, 2006) (amending the SDPA to comply with *Masterson I*). This court has also held that, to satisfy due process, the trier of fact in an SDPA proceeding must make an express finding that it is substantially probable the respondent would engage in the commission of sex offenses in the future if not confined. *Masterson I*, 207 Ill. 2d at 330.

¶ 29　　After an SDPA petition is filed, the trial court must appoint two psychiatrists to examine the individual personally and determine whether the individual is sexually dangerous. 725 ILCS 205/4 (West 1996). Following a trial, if the individual is found to be sexually dangerous, the individual is committed to the Department of Corrections for an indeterminate period of time until he recovers. 725 ILCS 205/8 (West 1998). The committed person may petition for release at any time after commitment, showing facts of recovery. 725 ILCS 205/9 (West 1998). When an individual committed under the SDPA files a petition for release, the Department of Corrections Director is required to send the court a social-psychiatric report on the individual, prepared by a social worker and psychologist under the supervision of a licensed psychiatrist. 725 ILCS 205/9 (West 1998).

¶ 30　　In comparison to the SDPA, the SVPA is a more recent statutory enactment, taking effect on January 1, 1998. 725 ILCS 207/1 (West 2000). The SVPA defines a sexually violent person, in relevant part, as:

> "[A] person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person

will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2000).

The term "mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2000).

¶ 31    The SVPA is limited only to those criminal offenses deemed "sexually violent" by the General Assembly. In particular, SVPA offenses include sexually motivated first degree murder, criminal sexual assault, aggravated criminal sexual assault, predatory criminal sexual assault of a child, and aggravated criminal sexual abuse. 725 ILCS 207/5(e)(1), (e)(2) (West 2000). The SVPA also applies to the solicitation, conspiracy or attempt to commit those same offenses. 725 ILCS 207/5(e)(3) (West 2000).

¶ 32    Because the SVPA applies only to sexually violent individuals subject to release or discharge from state custody, petitions under the SVPA must be filed no earlier than 90 days prior to the individual's release. 725 ILCS 207/15 (West 2000). After a petition is filed, the trial court must determine whether there is probable cause to believe the individual is a sexually violent person. 725 ILCS 207/30 (West 2000). If the trial court finds that probable cause exists, the court is required to order the individual to undergo a mental evaluation. 725 ILCS 207/30(c) (West 2000).

¶ 33    Although the SVPA is civil in nature, the individual subject to its provisions has a right to counsel, to remain silent, to present and cross-examine witnesses, and to have a jury trial. 725 ILCS 207/20, 25 (West 2000). At trial, the State is permitted to present expert testimony from a Department of Corrections evaluator and an Illinois Department of Human Services psychiatrist. 725 ILCS 207/35(b) (West 2000). The State must prove that the individual is a sexually violent person beyond a reasonable doubt. 725 ILCS 207/35(d) (West 2000).

¶ 34    When an individual is ordered by the trial court to submit to a mental evaluation under the SVPA, the individual is authorized to retain "experts or professional persons to perform an examination," and that examiner is guaranteed reasonable access to the individual. 725 ILCS 207/25(e) (West 2000). If the individual is indigent, on order of the trial court the county must pay the costs of a court-appointed expert or professional person to perform the individual's examination. 725 ILCS 207/25(e) (West 2000). Nonetheless, if the individual refuses to speak or cooperate with the State's chosen examiner, the individual's retained examiner may testify only to matters based on the individual's record and not from an examination of the individual. 725 ILCS 207/30(c) (West 1998).

¶ 35    If the individual is found to be a sexually violent person after the trial, the trial court must order the individual committed for an indefinite period until recovery. 725 ILCS 207/40(a) (West 2000). Following commitment, the SVPA requires periodic examination of the individual, the first examination report due within six months of the initial commitment, with subsequent reports every 12 months. 725 ILCS 207/55 (West 2000). A committed individual may also seek conditional release six months after the initial commitment order (725 ILCS 207/60 (West 2000)), or complete discharge if the Secretary of Human Services determines that the individual is no longer sexually violent (725 ILCS 207/65 (West 2000)). When an

individual seeks discharge, the State is authorized to choose an expert or professional person to examine the individual. 725 ILCS 207/65(a)(2), (b)(2) (West 2000). The State must prove by clear and convincing evidence that the individual is still a sexually violent person. 725 ILCS 207/65(a)(2) (West 2000).

¶ 36   After carefully comparing the SDPA and the SVPA, we conclude that respondent is not similarly situated to individuals committed under the SVPA. First, in contrast to the SDPA's broad applicability to all criminal offenses, the SVPA applies only to a limited number of criminal offenses deemed "sexually violent" by the General Assembly. Furthermore, the SVPA, unlike the SDPA, expressly requires a conviction, or a trial that ends in an insanity finding, of the most serious type of violent sex crimes. In other words, individuals who are subject to commitment under the SVPA constitute a distinct, and presumably more dangerous, group because they have been convicted, or tried but declared insane, of the most serious and violent types of sex offenses.

¶ 37   The two schemes also differ procedurally. As this court has already determined, "[t]he SDPA provides an alternative to criminal prosecution [citation], while the SVPA provides for commitment in addition to criminal proceedings." *People v. Burns*, 209 Ill. 2d 551, 571 (2004). Consequently, although the SDPA and the SVPA share a common goal of protecting the public from mentally disordered individuals who present a risk of sex-crime recidivism, and both potentially subject individuals to indefinite commitment, it is nonetheless apparent that they address separate groups of individuals in a manner unique to each group.

¶ 38   The SDPA is concerned with individuals who have been charged with any type of criminal offense and suffer from a mental disorder predisposing them to commit sex crimes. The SVPA, in contrast, is limited to persons with mental disorders who have been convicted of serious and violent sex offenses, and are facing potential release or discharge from state custody but continue to pose a risk to commit additional sex crimes. Put simply, the SDPA and the SVPA address two groups of individuals in completely different situations. See *Burns*, 209 Ill. 2d at 571 (concluding that "the discharge procedures in the SDPA differ from those set forth in the SVPA because they are *directed at different categories of offenders*" (emphasis added)).

¶ 39   Respondent's case illustrates this difference because, despite his confessed history of pedophilic behavior, he has not been convicted of the type of violent sex crime that would justify his commitment under the SVPA. Respondent has failed to demonstrate that he is similarly situated to individuals committed under the SVPA, and thus his equal protection challenge necessarily fails. Accordingly, we need not apply the rational basis standard to his claim. *Whitfield*, 228 Ill. 2d at 512-13.

¶ 40   Respondent's reliance on *Masterson I* is misplaced. As respondent notes, we held in *Masterson I* that the SVPA's definition of "mental disorder" must be read into the SDPA, but our holding was based on the ambiguity of that term in the SDPA. *Masterson I,* 207 Ill. 2d at 329; see *Burns*, 209 Ill. 2d at 570 (making the same observation about our holding in *Masterson I*). Here, the respective statutory sections on the selection of experts are unambiguous. Furthermore, contrary to respondent's assertions, we did not hold in

*Masterson I* that individuals subject to the SDPA are similarly situated to individuals subject to the SVPA.

¶ 41     Respondent also cites to our decisions in *In re Adoption of L.T.M.*, 214 Ill. 2d 60 (2005), and *In re D.W.*, 214 Ill. 2d 289 (2005). Those decisions, however, do not support respondent's position. In both those cases, we found that the party raising the equal protection challenge satisfied the necessary threshold showing that they were similarly situated to the comparison group. *L.T.M.*, 214 Ill. 2d at 76; *D.W.*, 214 Ill. 2d at 313-14. Here, respondent has failed to demonstrate that he is similarly situated to individuals committed under the SVPA. Thus, *L.T.M.* and *D.W.* are inapposite.

¶ 42                                III. CONCLUSION

¶ 43     For the reasons stated above, we conclude that respondent, as an individual subject to involuntary commitment under the SDPA, is not similarly situated to individuals subject to involuntary commitment under the SVPA. Accordingly, we reject his equal protection challenge to the SDPA (*Whitfield*, 228 Ill. 2d at 513), and affirm the appellate court's judgment.

¶ 44     Affirmed.