2021 IL App (1st) 190363-U

FIFTH DIVISION
Order filed: January 29, 2021

No. 1-19-0363

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 21663 |
| | ) | |
| DERRICK BALDWIN, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the defendant's convictions over his contentions that (1) the State was barred from prosecuting him in the instant case when he had already been adjudicated a sexually dangerous person on unrelated offenses and (2) his trial counsel was ineffective for failing to file a motion to suppress evidence on the grounds that his arrest pursuant to an investigative alert is unconstitutional.

¶ 2    Following a jury trial, the defendant, Derrick Baldwin, was convicted of two counts of

aggravated criminal sexual assault and one count each of home invasion and residential burglary.

He was sentenced to 29 years' imprisonment plus an indeterminate term (3 years to natural life) of mandatary supervised release (MSR).[1] On appeal, he argues that his convictions must be reversed because the State could not prosecute him in the instant case after he had already been adjudicated a sexually dangerous person on unrelated offenses. He also argues that his trial counsel was ineffective for failing to file a motion to suppress evidence on the grounds that his arrest pursuant to an investigative alert was unconstitutional. For the reasons that follow, we affirm.

¶ 3      In the instant case, no. 12 CR 21633, the defendant was charged by indictment with, *inter alia*, two counts of aggravated criminal sexual assault and one count each of home invasion and residential burglary based upon allegations that he entered the apartment of M.R. on October 28, 2012, without authority to do so and committed an act of sexual penetration upon her. On January 22, 2014, the defendant's first jury trial commenced, and the jury found him guilty on all charges. On June 16, 2014, the circuit court sentenced him to concurrent terms of 29 years' imprisonment. The defendant appealed (no. 1-14-2354).

¶ 4      In case no. 13 CR 2690, the defendant was charged with home invasion, residential burglary, aggravated criminal sexual abuse, and unauthorized video recording for an incident that occurred on October 6, 2012. On July 23, 2014, the State filed a petition pursuant to section 3 of the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/3 (West 2012), seeking to have the defendant declared a sexually dangerous person based on case no. 13 CR 2690. At the defendant's bench trial, the State presented two witnesses, Drs. Stanislaus and Weitl, who both testified that the defendant suffered from mental disorders, had criminal propensities to the commission of sex

---

[1] The circuit court also sentenced the defendant to a term of six months' imprisonment for contempt, to be served following the completion of his 29-year term, after the defendant interrupted and cursed at the court during sentencing.

offenses, and posed a substantial risk of sexually offending in the future if not confined. The State also introduced a certified copy of the defendant's conviction in case no. 12 CR 21663. On October 20, 2015, the trial court issued its written order, finding the defendant to be a sexually dangerous person and that it is substantially probable that he would continue to commit sex offenses in the future if not confined. On that same day, the trial court entered judgment on its findings and remanded the defendant to the custody of the Director of the Illinois Department of Corrections as guardian. The defendant filed an appeal (No. 1-16-0496).

¶ 5       Meanwhile, in appeal no. 1-14-2354, the State confessed error in the denial of the defendant's timely motion for a substitution of judge. On June 23, 2017, we reversed his convictions in case no 12 CR 21633 and remanded the case to the circuit court for a new trial. *People v. Baldwin*, 2017 IL App (1st) 142354-U.

¶ 6       On September 6, 2017, we granted the defendant's motion to stay appeal no. 1-16-0496, pending the retrial of case no. 12 CR 21663 in the circuit court.

¶ 7       On remand in case no. 12 CR 21663, the defendant initially proceeded *pro se*, filing several pre-trial motions, including, *inter alia*, a motion to quash arrest and suppress evidence. In his motion to suppress, the defendant sought to suppress evidence obtained pursuant to a search warrant from his laptop computer, cellphone, and a flash drive on the grounds that there was "no probable cause to execute the search warrant." The defendant stated in his motion the following facts: On November 1, 2012, he was "arrested on a misdemeanor warrant at a restaurant," and while he was in custody pursuant to that warrant, M.R. identified him from a physical lineup as the perpetrator. He also stated that he was still in custody when, on November 8, 2012, he was arrested for the instant offenses. At the defendant's next court date, the defendant's motion was

argued. The State informed the court that the defendant was in continuous custody following his November 1, 2012 arrest pursuant to a misdemeanor warrant for jumping a CTA turnstile when he was identified as the perpetrator in this case and arrested on November 8, 2012, on the instant charges. The defendant told the court that he was only challenging his November 8, 2012 arrest. The circuit court denied the defendant's motion without an evidentiary hearing, finding that the defendant did not dispute that his November 1, 2012 arrest was based upon a warrant or that he was in lawful custody when he was identified by the victim hours later, which resulted in his subsequent arrest on November 8, 2012.

¶ 8 On January 26, 2018, the defendant asked for an attorney and the court appointed the public defender's office.

¶ 9 The defendant's jury trial commenced on October 26, 2018. At trial, M.R. testified that she came home to her studio apartment in the early morning hours of October 28, 2012, after drinking with some friends. She went to sleep at around 3:30 a.m. and believed that she had locked her front door. She woke up when she felt something touching her vagina. As she awoke, she saw her blanket rise "like a mountain" and then saw a man run out of her bedroom. She testified that she saw the perpetrator's face when he looked back at her before stumbling through her front door and into the hallway. After he left, she went downstairs and reported the incident to the doorman, who called the police.

¶ 10 Officer Louis Novalez testified that, on November 1, 2012, he was in a downtown restaurant when he encountered the defendant, whom he recognized as the subject of an investigative alert. Officer Novalez called his sergeant to confirm the details of the investigative alert and then approached the defendant and announced his office. After verifying the defendant's

identity, he placed him under arrest. Office Novalez testified that, among the items in the defendant's possession when he was arrested were a ring, watch, wallet, a cellphone, and a bag with a laptop computer and a flash drive. He inventoried the items and turned them over to Detective Rose for investigation.

¶ 11    Detective Robert Rose testified that he was assigned to investigate M.R.'s case. He met with M.R. on October 31, 2012, and showed her a photo array, which included a photograph of the defendant, but she was unable to identify anyone as the perpetrator. On the evening of November 1, 2012, Detective Rose learned that the defendant had been arrested. He arranged for M.R. to view a physical lineup and she identified the defendant as the perpetrator. Detective Rose obtained a search warrant and searched the computer, flash drive, and cellphone in the defendant's possession at the time of his arrest. The search of the memory card in the cellphone revealed two photographs time-stamped shortly after 5 a.m. on October 28, 2012: one was of a female's crotch and legs under bedding, and the other was of bedding. On December 7, 2012, M.R. identified her vaginal and leg area and her bedding in the photos. M.R. still had the bedding and duvet cover and provided it to Detective Rose, who inventoried the items. Detective Rose published the items to the jury.

¶ 12    The State also presented K.G. and K.M., who testified to the defendant's prior bad acts for the purposes of, *inter alia*, *modus operandi*. K.G. testified that she went to bed at around 10 p.m. on August 15, 2012. She woke up at around 5:00 a.m. to use the bathroom when she saw a man inside her apartment. She screamed and the man ran out of her apartment. K.G. identified three photographs recovered from the defendant's phone as depicting her room and her legs and buttocks.

¶ 13    K.M. testified that she returned to her apartment in the early morning hours of October 6, 2012, and she believed that she locked her door. She did not recall waking at any point during that night. In the following days, she noticed that her digital camera was missing. On December 5, 2012, K.M. met with Detective Rose at the police station, where she identified three photographs recovered from the defendant's phone depicting her naked buttocks and a hand with a three-link ring.

¶ 14    The State recalled Detective Rose, who testified that he found the photos of K.G. and K.M. on the memory card of the phone recovered from the defendant. Detective Rose also testified that he identified the ring in the photo depicting K.M. as the one the defendant was wearing when he was arrested. Following Detective Rose's testimony, the State rested.

¶ 15    The defendant presented Officer Nora Gunning, who testified that on October 28, 2012, she and her partner responded to a call at a high rise downtown. Officer Gunning explained that her partner made a contact card, which is a mini summary of the events. Officer Gunning acknowledged that the contact card does not indicate that M.R. was sexually assaulted.

¶ 16    Officer David Magura testified that he went to a high rise building in Chicago at about 8:12 a.m. on October 28, 2012 and spoke with M.R. in the lobby. According to Officer Magura, M.R. refused medical attention after he told her she could go to the hospital. He also testified that M.R. did not tell him that she saw the intruder's face when he fell in the hallway. The defense then rested with the defendant electing not to testify on his own behalf.

¶ 17    Following their deliberations, the jury found the defendant guilty of all charges. After his trial, the defendant again requested to proceed *pro se*, which the court granted. He then filed a *pro se* motion to dismiss case no 12 CR 21663, arguing that the State could not pursue criminal charges

against him because he had been found sexually dangerous under the SDPA. According to the defendant, if he was mentally ill on October 6, 2012, when he committed the offense in 13 CR 2690, he must have been mentally ill on October 28, 2012, when he committed the instant offenses. The State responded by acknowledging that, under *People v. Galba*, 273 Ill. App. 3d 95 (1995), a defendant cannot be convicted of an offense and found sexually dangerous based on the same underlying offense. The State argued, however, that *Galba* did not apply here because the instant offense was not the underlying offense for the SDPA proceedings. The trial court agreed with the State and denied the defendant's post-trial motion.

¶ 18    The defendant also filed a *pro se* motion for a new trial, which raised 15 different arguments, including, *inter alia*, that he was barred from being prosecuted on the grounds that he had already been adjudicated a sexually dangerous person. The circuit court denied the defendant's motion for a new trial.

¶ 19    Following a sentencing hearing, the court merged all of the defendant's convictions into one count of aggravated criminal sexual assault and sentenced him to 29 years' imprisonment plus an indeterminate term (3 years to natural life) of MSR. As the court admonished the defendant regarding his appellate rights, the defendant interrupted and said the following: "Don't give me that bullshit about no 29 fucking years, motherfucker. I'm not fucking with you no more." The court responded that the defendant would be sentenced to 6 months for contempt to be served consecutively with his 29 years term. This appeal followed.

¶ 20    At the outset, we note that, on August 21, 2019, while the instant appeal was pending, we entered an order on motion of the defendant, lifting the September 6, 2017 stay in the defendant's appeal in the SDPA proceedings (appeal no. 1-16-0496). *People v. Baldwin*, 2020 IL App (1st)

160496, ¶ 12. On June 26, 2020, we vacated the circuit court's orders and judgment entered on October 20, 2015, finding the defendant to be a sexually dangerous person on the grounds that the court's judgment relied, in part, on the defendant's 2014 convictions in 12 CR 216331, which were subsequently reversed on appeal. *Id.* at ¶ 27. We remanded the matter to the circuit court for a new trial on the State's petition to declare the respondent a sexually dangerous person. *Id.* at ¶ 32.

¶ 21     On appeal in the instant case, the defendant first argues that his convictions and sentence should be vacated because criminally prosecuting him after he had already been adjudicated a sexually dangerous person in case no. 13 CR 2690 violated the purpose of the SDPA. The State responds that being adjudicated a sexually dangerous does not exempt the defendant from criminal culpability based upon the commission of separate criminal acts. The State also argues that the defendant's argument in this regard is moot because his adjudication as a sexually dangerous person was reversed on appeal.

¶ 22     Our review of issues involving statutory construction is *de novo* and is guided by well-established rules. *In re Detention of Lieberman,* 201 Ill. 2d 300, 307 (2002). The principal objective of statutory construction is to determine and give effect to the legislature's intent. *In re Detention of Powell,* 217 Ill. 2d 123, 135 (2005). "All other rules of statutory construction are subordinate to this cardinal principle." *Id.* at 135. The best evidence of legislative intent is the statutory language. *People v. Donoho*, 204 Ill. 2d 159, 171 (2003). We, therefore, first review the text of the SDPA.

¶ 23     "[T]he SDPA permits the State to seek an involuntary and indefinite commitment in lieu of criminal prosecution when a person believed to be sexually dangerous is charged with a criminal offense." *People v. Masterson*, 2011 IL 110072, ¶ 27. Section 3 of the SDPA provides that, when the State feels that a defendant charged with a criminal offense is a sexually dangerous person, the

State "may file with the clerk of the court in the same proceeding wherein such person stands charged with criminal offense, a petition in writing setting forth facts tending to show that the person named is a sexually dangerous person." 725 ILCS 205/3 (West 2014). In order to establish that a defendant is a sexually dangerous person within the meaning of the SDPA, the State is required to prove that he (1) suffers from a mental disorder that has existed for at least one year prior to the filing of the petition; (2) has criminal propensities to the commission of sex offenses; (3) has demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children; and (4) poses a substantial risk of sexually offending in the future if he is not confined. 725 ILCS 205/1.01 (West 2014). If a defendant is found to be a sexually dangerous person, "then the court shall appoint the Director of Corrections guardian of the [defendant] and [the defendant] shall stand committed to the custody of such guardian." 725 ILCS 205/8 (West 2014). Section 9 of the SDPA states that, once the defendant has recovered and the circuit court orders him discharged, "every outstanding information and indictment, the basis of which was the reason for the present detention, shall be quashed." 725 ILCS 205/9 (West 2014).

¶ 24     In urging reversal, the defendant does not cite to a specific provision of the SDPA that he contends bars the State from prosecuting a defendant criminally after successfully having him adjudicated a sexually dangerous person under the SDPA on an unrelated offense. Rather, he argues that prosecuting him after he had already been adjudicated a sexually dangerous person under the SDPA, even for a separate offense, "defie[s] the purpose of the SDPA." In support, he relies primarily on *People v. Allen*, 107 Ill. 2d 91 (1985), and *People v. Galba*, 273 Ill. App. 3d 95 (1995).

¶ 25    In *People v. Allen*, our supreme court stated that the aim of the SDPA is "treatment, not punishment" and that one of the purposes of the SDPA was "to prevent mentally ill persons from being held criminally responsible for crimes committed while mentally ill." 107 Ill. 2d at 101, 105. According to the defendant, when the court adjudicated him a sexually dangerous person under the SDPA, it necessarily found that he was mentally ill on October 6, 2012, when he committed the offenses charged in 13 CR 2690 and, if he was mentally ill then, "it logically follows that he was also mentally ill when the instant offense took place just 22 days later." The State argues that nothing in the text of the SDPA prevented it from prosecuting the defendant for crimes unrelated to the charges that resulted in him being adjudicated a sexually dangerous person. We agree with the State.

¶ 26    As mentioned, our task on review is to determine and give effect to the legislature's intent, and the best evidence of legislative intent is the language of the statute. After reviewing the SDPA, we find no textual support for the defendant's contention that the State cannot prosecute him for crimes separate and distinct from those that formed the basis of his civil confinement under the SDPA.

¶ 27    We find that *People v. Galba*, 273 Ill. App. 3d 95 (1995), which the defendant relies on, best illustrates the deficiencies in his argument. In *Galba*, the defendant pled guilty to aggravated kidnaping and aggravated criminal sexual abuse. 273 Ill. App. 3d at 96. As part of his plea deal, the defendant agreed to facts supporting a finding that he was a sexually dangerous person, and accordingly, he was civilly committed under the SDPA. *Id*. On appeal, we held that prosecuting a defendant and civilly committing him as a sexually dangerous person for the same underlying offense violated the SDPA. *Id.* at 101. Specifically, we found that to hold otherwise would render

section 9 of the SDPA meaningless because section 9 states that the underlying charges against a defendant remain until such time as he has recovered and the committing court orders him discharged, at which time "the underlying information or indictment must be quashed." *Id.*

¶ 28 Here, unlike in *Galba*, the defendant's criminal convictions were not based on the same underlying charges that formed the basis of his civil commitment under the SDPA, and therefore, his prosecution does not run afoul of section 9 of the SDPA. Simply put, in October 2012, the defendant committed multiple criminal acts on two separate nights and against two separate victims and was charged under two separate indictments. The SDPA mandates that, for each indictment, the State must elect whether to prosecute the defendant in a criminal proceeding or file a petition under the SDPA. In the instant case, the State elected to prosecute the defendant criminally, and in case no. 13 CR 2690, it elected to file a petition under the SDPA. In both instances, the State comported with the provisions of the SDPA.

¶ 29 In essence, the defendant is arguing that, because the circuit court found that he suffered from mental disorders when it adjudicated him a sexually dangerous person, he could not have been found guilty in the instant case. The defendant appears to equate a finding that he suffered from a mental disorder as defined by the SDPA with a defense of not guilty by reason of insanity. Section 4.03 of the SDPA defines mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2012). In contrast, section 6-2(a) of the Illinois Criminal Code of 2012 (Code) provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2012). The Code also provides that "[t]he

terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." 720 ILCS 5/6-2(b) (West 2012). Put simply, a finding that a defendant suffers from a mental disorder under the SDPA is a separate inquiry than not guilty by reason of insanity that requires separate proof. In the present case, there is no evidence in the record to support a finding that the defendant lacked substantial capacity to appreciate the criminality of his conduct. In other words, there is no evidence that the defendant was insane when he committed the crimes for which he was charged. Accordingly, the State was not barred from prosecuting the defendant in the instant case even after he had been civilly committed under the SDPA.

¶ 30    In reaching this decision, we also note that a defendant may be found guilty of a crime even if he was suffering under a mental illness during the commission of the offense. See 720 ILCS 5/6-2(c) (West 2012) ("A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill."). However, in order to be entitled to such a finding, the defendant was first required to raise the insanity defense, which he did not do here. See 725 ILCS 5/115-3(c)(1)-(3) (West 2012).

¶ 31    The defendant next contends that his counsel was ineffective for failing to file a motion to suppress evidence on the grounds that his arrest was based solely on an investigative alert rather than an arrest warrant.

¶ 32    Claims of ineffective assistance of counsel are evaluated under the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that

the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687; *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). When a defendant claims that his counsel provided ineffective assistance by failing to file a motion to suppress, he "must show, first, a reasonable probability that the motion would have been granted and, second, that the outcome of the trial would have been different if the motion had been granted." *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). The defendant has the burden of establishing both prongs of the *Strickland* test. *People v. Burks*, 343 Ill. App. 3d 765, 775 (2003).

¶ 33    To begin, the State challenges the defendant's contention that he was arrested based on an investigative alert, not a warrant. According to the State, the defendant was arrested on November 1, 2012, pursuant to a misdemeanor arrest warrant for jumping a CTA turnstile and then "he was held pending investigation on the investigative alert for M.R.'s burglary" and "four hours later [he] was identified by M.R." as the perpetrator. The State also argues that the defendant admitted to these facts in his *pro se* motion to suppress, and therefore, he has forfeited this issue on appeal. The defendant responds that the record does not contain a misdemeanor arrest warrant and his trial counsel should have discovered this fact when he reviewed the record. The defendant also argues that the State's contention that he was arrested pursuant to a misdemeanor warrant is directly contradicted by Officer Novalez's testimony at trial.

¶ 34    We have reviewed the record and it reflects that the defendant stated in his *pro se* motion to suppress evidence that his November 1, 2012 arrest was pursuant to a misdemeanor warrant. And although the defendant is correct that there is no copy of any such misdemeanor warrant in the record, there are several documents in the record that reference a warrant in relation to his November 1, 2012 arrest, including the defendant's Chicago Police Department "rap sheet" and

the transcript of the defendant's Illinois State Police criminal history. That said, the record also reflects that Officer Novalez testified at trial that he arrested the defendant after seeing him in a restaurant and immediately calling his sergeant because he was "aware of an investigative alert on [the defendant]." However, Officer Novalez did not testify as to the facts underlying the investigative alert, nor is the investigative alert found in the record. In other words, it is not known whether the investigative alert even related to the events of the instant case. Nevertheless, the simple fact is that the defendant admitted in his *pro se* motion to suppress that he was arrested on November 1, 2012, pursuant to a misdemeanor warrant. Given this record, we conclude that he cannot now claim that his trial counsel was ineffective for failing to file a motion to suppress on the grounds that his arrest was unconstitutional because it was based on an investigative alert.

¶ 35    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.