2024 IL App (1st) 240264-U
Order filed: December 19, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-24-0264

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TALEB KANDEEL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE HEALTH AND HOSPITALS | ) | |
| CORPORATION d/b/a ADVOCATE CHRIST | ) | |
| MEDICAL CENTER, | ) | No. 18 L 1384 |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| (Abdul-Hamid Shahbain, M.D., and Shahbain | ) | |
| International Medicine, Ltd., | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendants-Appellants). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The first verdict rendered by the jury on plaintiff's medical malpractice complaint was legally inconsistent. The trial court sent the jury to redeliberate and it returned a second verdict in favor of plaintiff. We affirmed, finding that the court committed no abuse of discretion by sending the jury back to redeliberate.

¶ 2    Plaintiff, Taleb Kandeel, filed a medical malpractice action against defendants, Abdul-

Hamid Shahbain, M.D., and Shahbain Internal Medicine, Ltd., and Advocate Christ Medical

Center (Advocate). Advocate settled with plaintiff prior to trial and is not a party to this appeal. The jury initially returned a verdict finding plaintiff 60% negligent but awarding him damages in violation of section 2-1116 of the Code of Civil Procedure (Code), which bars a plaintiff from recovering any damages when his contributory negligence is more than 50% of the proximate cause of his injury. 735 ILCS 5/2-1116 (West 2022). The trial court instructed the jury to continue deliberations. Upon further deliberations, the jury returned a second verdict finding plaintiff 50% negligent and again awarding him damages. On appeal, defendants contend that the court never should have directed the jury to return a second verdict. Instead, the court should have entered judgment in their favor on the first verdict, based on the jury's finding that plaintiff was 60% negligent. Defendants ask us to enter judgment in their favor or, in the alternative, to grant them a new trial. We affirm.

¶ 3    In February 2018, plaintiff filed a medical malpractice action alleging that on January 21, 2015, he was admitted to Advocate and underwent heart surgery. Following the surgery, plaintiff remained hospitalized through February 20, 2015. Dr. Shahbain was his attending physician during his hospitalization. While at the hospital, plaintiff suffered from post-operative delirium, including hallucinations. On February 12, 2015, while experiencing delirium, confusion, and hallucinations, plaintiff left his hospital bed and walked to the bathroom, where he fell and permanently injured his right eye.

¶ 4    Count I against Dr. Shahbain and Shahbain Internal Medicine, Ltd., alleged that Dr. Shahbain was negligent for failing to properly prescribe or monitor plaintiff's medication to alleviate his delirium and for failing to properly monitor plaintiff or order safety measures that would have prevented him from falling. Count II alleged that Advocate was vicariously liable for Dr. Shahbain's negligence. Count III alleged that Advocate was vicariously liable for the

negligence of its nurses and other hospital personnel in failing to prevent plaintiff from falling. Count IV alleged that Advocate was institutionally negligent for failing to properly train and supervise its nurses and other hospital personnel. Advocate subsequently settled with plaintiff, and the cause proceeded to trial against Dr. Shahbain and Shahbain Internal Medicine, Ltd.

¶ 5    At trial, plaintiff testified that he was 58 years old at the time of trial and had a history of diabetes, high blood pressure, and coronary heart disease. In January 2015, he went to the emergency room at Advocate because he was experiencing chest pain. He underwent open heart surgery on January 23. Dr. Shahbain was his attending physician during his subsequent hospital stay. During his post-operative stay at the hospital, plaintiff experienced a number of hallucinations. For example, at various times he thought that he was tied to the ceiling with a copper wire, that he walked inside of his television, that a man with tape on his eye demanded cash in exchange for medicine, and that another man tried to choke him with a cable. Plaintiff had never experienced hallucinations prior to his surgery.

¶ 6    The nurses told plaintiff he was not to leave his bed without their assistance. However, he did so anyway whenever he hallucinated that someone was trying to kill him.

¶ 7    In the late evening on February 11, plaintiff needed to use the bathroom. He tried to call for a nurse but nobody came. He got out of bed and began hallucinating that he was "walking on an air mattress in the sky." He went into the bathroom and decided to urinate in the shower. He fell down and injured his right eye. Hospital personnel tried to assist him but he thought they were murderers so he refused to talk to them even as he laid there injured. Plaintiff subsequently underwent eye surgery on February 12 and was released from the hospital on February 20. Plaintiff later underwent a second surgery on March 12, 2015, during which his right eyeball was removed and replaced with a prosthetic.

¶ 8     Mohammed Kandeel, plaintiff's son, testified to his hospital visits with plaintiff in the days leading up to his fall. Mohamed testified that from February 6 to February 11, plaintiff made insensible comments that were not true, such as that water was leaking on his head or that someone was trying to choke him with a cable. Plaintiff also frequently got up to use the bathroom, even though Mohammed told him that he was supposed to call for a nurse first. Sometimes plaintiff expressed his understanding that he was supposed to call for a nurse, and sometimes he seemed not to understand.

¶ 9     Malek Kandeel, plaintiff's other son, also testified to his hospital visits with plaintiff from February 6 to February 11. Malek testified that plaintiff "wasn't in his right state of mind," for instance he asked about wrestling practice even though Malek had not wrestled in years. Sometimes plaintiff would speak more cogently and ask about Malek's current job, but then he would go back to asking Malek about events that had happened years earlier. Malek visited plaintiff the night before the fall, from 7 p.m. to about 10:30 p.m. on February 11. During that time-period, plaintiff seemed confused and unable to understand what Malek was saying to him.

¶ 10    Dana Novak testified that she was plaintiff's cardiac unit nurse who worked a shift from 7 p.m. on February 11 to about 7:20 a.m. on February 12. Novak explained that as plaintiff had recently undergone open heart surgery, he was still weak and his chest was vulnerable. Therefore, Novak informed plaintiff he was not to leave his bed without assistance because he was a fall risk. To prevent plaintiff from leaving the bed unassisted, bed alarms were in place to notify the nurses of his movements, and bed rails were up. Nonetheless, virtually every time Novak left plaintiff and went back to the nurse's station, his bed alarm would go off indicating that plaintiff was exiting the bed on his own. She would come in, lead him back to bed, and reset the alarm.

¶ 11    One of plaintiff's sons visited with him on February 11 and left at about 11:50 p.m. Novak assessed plaintiff and noted that he appeared awake and alert and responsive to her. She left his room and was just outside, working on a rolling computer.

¶ 12    At about 12:15 a.m. on February 12, plaintiff's bed alarm went off. Novak ran into the room and saw plaintiff walking rapidly toward the bathroom. Novak yelled out that plaintiff was on the move, and several other nurses came in. Novak and one of the other nurses caught up to plaintiff, who told them he needed to urinate. They tried to direct him toward the toilet, but instead he turned toward the shower, put his hands up on the wall and began urinating in the shower stall. After he finished urinating, his hands slipped and he fell forward in the shower, striking his face on the wall. Novak and the other nurse lowered plaintiff down and called for a doctor. Then they walked him back to his bed.

¶ 13    The doctor examined plaintiff, saw that he had injured his right eye, and ordered a CT scan. Novak placed gauze over plaintiff's right eye and led him to the elevator to take him to the CT scanner. Along the way, plaintiff admitted to Novak that the injury was his own fault. Novak testified that she and her staff did "everything" possible to prevent his fall, including by telling him to call for help ambulating out of bed and by regularly checking on him and putting in place the bed alarm and bed rails. Novak did not think that plaintiff was suffering from hallucinations at the time of his fall.

¶ 14    Dr. Shahbain was plaintiff's post-operative attending physician. He testified that following his open-heart surgery, plaintiff was intubated with a breathing tube from January 23 to February 5 (other than a period on February 1 when the tube was temporarily removed). Dr. Shahbain saw plaintiff on January 26th after the surgery, and he remained on a respirator. Plaintiff was hypoxic, meaning he required a high degree of oxygen and so he could not yet be weaned from the machine.

Dr. Shahbain remained in contact with plaintiff's thoracic surgery team and pulmonologists to ensure that all of his doctors had the same information regarding plaintiff's condition. Dr. Shahbain was in regular contact with plaintiff's family.

¶ 15    On January 29, plaintiff was taken off sedation medication in anticipation of removing him from the respirator. On January 30, plaintiff was "minimally responsive" and still hooked to the respirator. His progress was slow.

¶ 16    Plaintiff's breathing tube was extubated (removed) on February 1. He sustained respiratory distress and so the tube was reintubated and the respirator took over the work of breathing for him again. Dr. Shahbain remained in contract with plaintiff's family, explaining the changes in plaintiff's condition.

¶ 17    Plaintiff underwent a bronchoscopy on February 4 in which a camera was inserted into the endotracheal tube to look for any swelling or tumors. Significant swelling was found and so plaintiff was placed on an anti-inflammatory steroid medicine. Plaintiff was able to be weaned from the respirator by February 6.

¶ 18    Dr. Shahbain saw plaintiff on February 8 and noted that he was alert. On February 9, ambulation was ordered, meaning that plaintiff was to walk with assistance. On that day, plaintiff ambulated about 10 feet. By February 11, he was able to ambulate about 30 feet. Defendant never indicated any delirium. Dr. Shahbain hoped to discharge him in one or two days. However, plaintiff fell and injured himself just after midnight on February 12.

¶ 19    Dr. Shahbain testified that he had complied with the standard of care in his treatment of plaintiff.

¶ 20    On cross-examination, Dr. Shahbain testified that as attending physician, he was responsible for managing plaintiff's overall patient care.  Dr. Shahbain admitted that he was aware

of a note written by Nurse Willis on February 6 stating that plaintiff was currently combative and confused. He was aware of a note written by Nurse Maxey on February 7 stating that plaintiff was combative and engaging in "inappropriate behavior." He was aware of a note written by Nurse Brown on February 8 stating that plaintiff was punching the side rails of his bed, causing his knuckles to bruise and bleed, and that his mental status was altered. Dr. Shahbain also was aware that plaintiff was reporting hallucinations from February 6 to February 10. Dr. Shahbain never called for a consultation with a neurologist or psychiatrist, because he did not think such a consultation was necessary as plaintiff was "directable and was getting better every day." Plaintiff also was being treated with antianxiety medication and "was acting appropriately in multiple other nursing documentations." Dr. Shahbain made no effort to assess plaintiff for delirium.

¶ 21    On redirect-examination, Dr. Shahbain testified that none of plaintiff's many different doctors ever diagnosed him with delirium.

¶ 22    Dr Jeffrey Rothschild, plaintiff's expert, testified by evidence deposition that he is board certified in internal medicine. He reviewed plaintiff's medical records, which showed that plaintiff was admitted to the hospital for angina, chest pain, and acute coronary syndrome and underwent a cardiac catheterization and a coronary artery bypass graft. Plaintiff had a very complicated recovery after the surgery, as he had difficulty coming off the respirator and did not do well the first time his breathing tube was removed. He also had to undergo a post-operative bronchoscopy to clean out his lungs.

¶ 23    Dr. Rothschild testified to the several notes created by plaintiff's nurses from February 6 to February 10 describing plaintiff's confusion and combativeness and indicating that he was experiencing hallucinations. Dr. Rothschild testified that these notes showed that plaintiff was suffering from delirium, a disorder of the brain frequently exhibited by behavioral changes and

hyperactivity and irritability. Delirium also can cause hallucinations and add to his risk of falling. When a patient suffers from delirium, his physician should review his pain medications to ensure that none of them contain ingredients that can exacerbate the frequency and severity of the delirium. The physician can also add certain medications alleviating the worst symptoms of delirium.

¶ 24 Dr. Rothschild noted that Dr. Shahbain was aware of plaintiff's altered mental state (confusion, combativeness, hallucinations) indicating delirium, but he made no effort to treat plaintiff's delirium by cutting back or changing his medications or consulting with a neurologist and/or a psychiatrist. Dr. Rothschild testified that Dr. Shahbain violated the standard of care by failing to treat plaintiff's delirium or to call for a neurology or psychiatric consultation. Dr. Rothschild further opined that plaintiff would not have fallen in the bathroom and injured his eye if Dr. Shahbain had recognized and treated plaintiff's delirium prior thereto.

¶ 25 Dr. Hiren Shah, defendants' expert, testified that he is board certified in internal medicine and is an associate professor of medicine at Northwestern University. Dr. Shah reviewed plaintiff's medical records and determined there was no evidence he suffered from delirium prior to his fall in the bathroom. Dr. Shah recognized that in the days before the fall, plaintiff exhibited agitation and aggressive and impulsive behavior, but that such behavior was not surprising or unusual for someone who had just been removed from a breathing machine and was not indicative of delirium. Dr. Shah opined that Dr. Shahbain met the standard of care in his treatment of plaintiff and that he was not negligent in failing to diagnose and treat plaintiff for delirium.

¶ 26 At the conclusion of the case, the court provided the jury with verdict forms A, B, and C. Form A stated that the jury was finding in favor of plaintiff and against defendants and provided for an itemization of damages for disfigurement, past disability, future disability, past pain and

suffering, and future pain and suffering. Form B provided for the same finding in favor of plaintiff and itemization of damages, reduced by the percentage of negligence attributed to plaintiff. Form C provided for a finding in favor of defendants and against plaintiff. The court instructed the jury as follows:

"If you find for Taleb Kandeel and against Abdul Hamid Shahbain, M.D. and if you further find that Taleb Kandeel was not contributorily negligent, then you should use Verdict Form A.

If you find for Taleb Kandeel and against Abdul Hamid Shahbain, M.D. and if you further find that Taleb Kandeel's injury was proximately caused by a combination of Abdul Hamid Shahbain, M.D.'s negligence and Taleb Kandeel's contributory negligence and that Taleb Kandeel's contributory negligence was 50% or less of the total proximate cause of the injury or damage for which recovery is sought, then you should use Verdict Form B.

If you find for Abdul Hamid Shahbain, M.D. and against Taleb Kandeel, or if you find that plaintiff's contributory negligence was more than 50% of the total proximate cause of the injury or damage for which recovery is sought, then you should use Verdict Form C."

¶ 27    The jury returned a verdict using verdict form B as follows:

"We, the jury, find for Taleb Kandeel and against Abdul Hamid Shahbain, M.D. and Shahbain Internal Medicine, Ltd. and further find the following:

First: Without taking into consideration the question of reduction of damages due to the negligence of Taleb Kandeel, we find that the total amount of damages suffered by Taleb Kandeel as a proximate result of the occurrence in question is $4,900,000 itemized as follows:

| | |
|---|---|
| Disfigurement: | $1,600,000 |
| Past Disability: | $400,000 |
| Future Disability: | $1,100,000 |
| Past Pain and Suffering: | $800,000 |
| Future Pain and Suffering: | $1,000,000 |

Second: Assuming that 100% represents the total combined negligence of all persons whose negligence proximately contributed to the plaintiff's injuries including Taleb Kandeel and Abdul Hamid Shahbain, M.D., we find that the percentage of such negligence attributable solely to Taleb Kandeel is percent 60 (%).

Third: After reducing the total damages sustained by Taleb Kandeel by the percentage of negligence attributable solely to Taleb Kandeel we assess Taleb Kandeel's recoverable damages in the sum of $1,960,000."

¶ 28    Although the jury concluded that plaintiff was 60% negligent, the verdict was rendered on a form reserved for use when plaintiff's negligence is 50% or less. Recognizing the error, and the inconsistency in awarding plaintiff damages while also finding him more than 50% negligent, the court held a sidebar outside the presence of the jury and then brought the jury back in and instructed them as follows:

"Ladies and gentlemen, please remain seated. I know that you did return a verdict. What I'm asking you to do is reread the jury instructions and then choose the verdict form based on your deliberations. So I'm asking you to reread the instructions. Nobody did anything wrong. We're just asking you to reread the instructions and then fill in the verdict form according to the instructions. Okay? I'm going to give these back. I have three clean copies of verdict."

¶ 29 After the jury retired, the court held a sidebar with the parties and noted that defendants had objected off the record to its decision to inform the jury to reread the instructions and render a new verdict. The court then gave defendants the opportunity to make their objections on the record. Defendants argued that the court should have simply entered judgment in their favor because the jury had found plaintiff 60% negligent.

¶ 30 The jury subsequently returned another verdict in favor of plaintiff using verdict form B, which now stated that the total amount of damages was $3,920,000, that plaintiff was 50% contributorily negligent, and that his recoverable damages was $1,960,000. The court then polled the jury to determine whether the verdict in favor of plaintiff for $1,960,000 was the intended result, and each juror responded affirmatively. The trial court entered judgment on the second verdict.

¶ 31 Defendants filed a posttrial motion arguing that the trial court never should have sent the jury to redeliberate and instead should have entered judgment in their favor pursuant to the first verdict, which found that plaintiff was 60% contributorily negligent and therefore barred from recovering damages under section 2-1116 of the Code. Defendants argued that to the extent that the first verdict inconsistently awarded plaintiff damages while at the same time finding him more than 50% contributorily negligent, the trial court could have rectified the mistake by "molding" the verdict into a judgment in their favor, thereby reflecting the jury's true intent. Defendants asked the court to correct its error in entering judgment for plaintiff on the second verdict, and to instead enter judgment in their favor pursuant to the first verdict. In the alternative, defendants asked for a new trial.

¶ 32 The trial court denied defendants' posttrial motion. Defendants appeal.

¶ 33    First, defendants argue that the trial court erred in its handling of the jury's first verdict. The court had instructed the jury that if it found plaintiff's negligence was 50% or less of the total proximate cause of his injury, it should use verdict form B to award plaintiff damages reduced by his percentage of negligence. If plaintiff's negligence was more than 50%, the court instructed the jury to use verdict form C to find in favor of defendants. In disregard of the instructions, the jury's first verdict was returned on form B and awarded plaintiff damages even though it found him more than 50% negligent. The verdict awarding plaintiff damages while finding him more than 50% negligent violated section 2-1116 of the Code and was legally inconsistent. *Hassard v. DS Retail, LLC*, 2023 IL App (4th) 220687, ¶ 46. Defendants contend that based on the jury's finding that plaintiff was 60% negligent, the court should have entered judgment in their favor instead of sending the jury back to redeliberate and return a second verdict. Our review is for an abuse of discretion. See *Mrowca v. Chicago Transit Authority*, 317 Ill. App. 3d 784, 786 (2000).

¶ 34    Our supreme court has held that a civil verdict need not be logically consistent, only that it must be legally consistent. *Redmond v. Socha*, 216 Ill. 2d 622, 650 (2005).There are two types of legally inconsistent verdicts. *Id.* at 643. The first type consists of those involving a single verdict that is allegedly internally inconsistent or inherently self-contradictory. *Id.* The second type consists of multiple claims made by one or more parties and a verdict as to one claim is inconsistent with a verdict as to another claim. *Id.* A verdict is not legally inconsistent unless it is absolutely irreconcilable, meaning no reasonable hypothesis supports it. *Mrowca*, 317 Ill. App. 3d at 786.

¶ 35    A legally inconsistent verdict can be corrected prior to the recording of the verdict and the discharge of the jury. *Miller v. Pillsbury Co.*, 56 Ill. App. 2d 403, 412 (1965); *Hassard*, 2023 IL App (4th) 220687, ¶ 41. "If the meaning of the jury can be ascertained and a verdict on the point in issue can be made out the court will mold it into form and make it serve." *Western Springs Park*

*District v. Lawrence*, 343 Ill. 302, 311 (1931). However, the trial court should not amend a verdict to reach a determination it believes the jury *ought* to have made. *Anderson v. Smith*, 91 Ill. App. 3d 938, 941 (1980). Instead, an amendment must reflect the clear intent of the jury. *Id.*

¶ 36    In the instant case, defendants argue that the court should have reconciled the legal inconsistency in the first verdict by finding that the jury's intent was to enter judgment for defendants and that the award of damages was made only because it erroneously filled out the wrong form (verdict form B) for when a plaintiff is less than 51% contributorily negligent. Since the jury found that plaintiff was 60% contributorily negligent, it meant to fill out verdict form C and find in defendants' favor without awarding any damages to plaintiff. The trial court should have molded the verdict to reflect this intent instead of sending the jury back to redeliberate and return a second verdict.

¶ 37    Plaintiff counters that there is another plausible construction of the first verdict, namely, that the jury meant to award him $1,960,000 in damages and that its mistake was in finding him 60% contributorily negligent. Under plaintiff's construction, the legal inconsistency in finding him more than 50% negligent while also awarding him damages could have been reconciled by molding the verdict to reduce his percentage of fault.

¶ 38    We find that the jury's intent in returning the first verdict was not clear, where it disregarded the trial court's instructions and awarded plaintiff $1,960,000 in damages despite finding him more than 50% contributorily negligent. The jury's first verdict could not be "molded into form and made to serve" where there was continuing doubt as to its meaning. *Id.* at 940. Given the legal inconsistency in the verdict and the confusion surrounding the jury's intent, the trial court was well within its discretion to send the jury back to redeliberate and return a second verdict in conformance with the jury instructions. See *Miller*, 56 Ill. App. 2d at 412.

¶ 39    Defendants argue that instead of sending the jury back to redeliberate, it should have polled the jury pursuant to *Mrowca,* 317 Ill. App. 3d at 786. Similar to the instant case, the jury in *Mrowca* awarded the plaintiff damages in her negligence action against the CTA while also setting her contributory negligence as being 60% of the total cause of the accident. *Id.* at 785. The jury rendered its verdict on a form which it had been instructed was for use only when the plaintiff's liability was *less* than 50%. *Id.* To determine why the jury had used that verdict form, the trial court polled the jury as to whether it believed the plaintiff was 60% negligent. *Id.* Each of the jurors answered in the affirmative and the court then entered judgment in favor of the CTA in accordance with section 2-1116 of the Code. *Id.* On the plaintiff's appeal, we affirmed, holding that the trial court committed no abuse of discretion by polling the jurors to determine the intent underlying its verdict. *Id.*

¶ 40    While our holding in *Mrowca* was that polling the jury was an acceptable way to discern the jury's intent when it has returned an inconsistent or otherwise ambiguous verdict, we did not hold that polling the jury was the *only* way to clarify its intent. As discussed earlier in this order, we have long held that prior to the recording of the verdict and the discharge of the jury, the trial court can inform the jury of an inconsistency and send them back to reconsider. *Miller*, 56 Ill. App. 2d at 412. The trial court utilized this method in the instant case when the jury returned a legally inconsistent verdict. The trial court committed no abuse of discretion in so doing.

¶ 41    Defendants also argue that the trial court improperly prejudiced the jury against them by sending it back to "correct" the first verdict, thereby somehow influencing the jury to return the second verdict in plaintiff's favor. Our review of the record indicates that defendants are wrong when they place the word "correct" in quotation marks to indicate that the trial court used that word when instructing the jury to redeliberate. The court never told the jury to "correct" its verdict.

Rather, it told the jury to "reread the instructions and then fill in the verdict form according to the instructions." The court's statement in no way indicated or suggested to the jury how it should rule or that it should return a verdict for plaintiff and against defendants.

¶ 42    Having determined that the trial court committed no abuse of discretion in its handling of the first verdict and its decision to send the jury back to redeliberate and return a second verdict, we proceed to address defendants' remaining contentions of error.

¶ 43    Defendants argue that the court erred the day before trial while considering plaintiff's objections to certain portions of Dr. Rothschild's evidence deposition. Plaintiff objected to the following testimony given by Dr. Rothschild during his cross-examination by defense counsel:

"Q. You fault Dr. Shahbain and Dr. Shahbain alone for not making this diagnosis [of delirium], true?

A. No."

¶ 44    The court sustained the objection on the basis that Dr. Shahbain's testimony violated motion *in limine* No. 22 barring defendants from introducing "any" evidence or testimony that plaintiff sued other parties. The court found that the jury could infer from defendants' questioning of Dr. Rothschild that he faulted other medical professionals who also had been sued. Defendants argue on appeal that plaintiff waived the objection by failing to first raise it in the evidence deposition instead of waiting to raise the objection on the eve of trial. Defendants cite Rule 213(c), which states that "[g]rounds of objection to the competency of the deponent or admissibility of testimony which might have been corrected if presented during the taking of the deposition are waived by failure to make them at that time." Ill. R. S. Ct. R. 213( c) (eff. Jan. 1, 1967).

¶ 45    *Somers v. Quinn*, 373 Ill. App. 3d 87 (2007), is informative on the issue of whether plaintiff waived his objection here. In *Somers*, the defendant filed a motion *in limine* on the day of trial to

exclude an expert witness's evidence deposition criticizing the defendant's treatment of plaintiff. *Id.* at 89. The objection was premised on the expert's lack of a medical license at the time of his evidence deposition. *Id.* at 90. The trial court granted the motion. *Id.* On appeal, plaintiff argued that the defendant waived his objection by failing to raise it at the evidence deposition in violation of Rule 213(c). *Id.* at 97. We noted that under Rule 213(c), an objection is waived only if the grounds for the objection could have been corrected if presented during the taking of the deposition. I*d.* We cited cases holding that where a deponent's testimony is based on hearsay or lacks proper foundation, or where the deponent is asked a leading question, the impropriety may potentially be remedied at the deposition and therefore the failure to object at the deposition constitutes a waiver. *Id.* at 98. By contrast, the expert's lack of a medical license could not be remedied during the deposition, and therefore the failure to object during the deposition did not waive the defendant's later objection at trial. *Id.*

¶ 46    Similarly, in the present case, the grounds for plaintiff's objection were not to the form of a question or to foundation or to any other issue that could have been remedied at the deposition; rather, the objection was based on the inadmissibility of Dr. Rothschild's testimony faulting other medical professionals who also had been sued. The inadmissibility of Dr. Rothschild's testimony could not have been corrected at the time the deposition was taken and therefore the subsequent objection thereto was not waived. See also *Schultz v. Richie*, 148 Ill. App. 3d 903, 908 (1986) (holding that where the expert's testimony was irrelevant and could not have been corrected at the time of his deposition, defendants' subsequent objections at trial to the relevancy of his testimony were not waived).

¶ 47    Next, defendants argue that the trial court erred by allowing plaintiff to call an undisclosed witness, Malek Kandeel, in violation of Rule 213(f). Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018). Rule

213(f) mandates the pretrial disclosures of lay witnesses and the subjects on which they will testify, as well as the disclosure of expert witnesses and the opinions they are expected to elicit. *Id.* Admission of evidence pursuant to Rule 213 will not be reversed absent an abuse of discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004).

¶ 48 We find no abuse of discretion here. The record shows that about one week before trial, defendants filed a motion seeking leave to file an affirmative defense that plaintiff was contributorily negligent. Specifically, defendants argued that while having "full capacity and understanding," plaintiff failed to call for the nurses on the night of his fall and also failed to cooperate with the nursing staff and to stay in his bed unless assisted. The court held a hearing on the motion two days before trial. At the hearing, plaintiff argued that the new defense of contributory negligence came as a surprise and that if the court granted defendants leave to add this defense, then plaintiff should be permitted to call his son, Malek, to offer testimony in rebuttal. Malek was present with plaintiff shortly before his fall and could testify to his observations that plaintiff lacked "full capacity and understanding." Defendants argued that plaintiff had never disclosed having a son named Malek. Plaintiff pointed out that defendants were incorrect, as plaintiff had identified Malek in his discovery deposition. The trial court granted defendants leave to add the defense of contributory negligence and it allowed plaintiff to call Malek as a witness to testify to plaintiff's state of mind shortly before the fall.

¶ 49 Defendants argue that pursuant to *Sullivan*, the trial court should have excluded Malek as a witness for nondisclosure. In *Sullivan*, our supreme court listed the following factors to consider when deciding whether to exclude a witness for nondisclosure: (1) the surprise to the adverse party; (2) the prejudicial effect of his testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling

the witness. *Id.* at 110. Here, defendants cannot claim unfair surprise where they were made aware of Malek in plaintiff's discovery deposition and they were informed he would only be called in response to defendants' own last-minute decision to assert a new contributory negligence defense. There was nothing overly prejudicial about Malek's testimony where it was largely cumulative to the nurse's reports and plaintiff's testimony regarding his altered mental state near the time of his fall. Plaintiff did not act in bad faith by failing to disclose Malek sooner, as the decision to call him as a witness was not made until defendants decided on the eve of trial to raise plaintiff's contributory negligence as an affirmative defense. On these facts, we find no abuse of discretion in the court's decision to grant plaintiff's request to amend the witness list to add Malek. The court's ruling was in accordance with Rule 213(k), which states that "This rule is to be liberally construed to do substantial justice between or among the parties." Ill. S. Ct. R. 213(k) (eff. Jan. 1, 2018).

¶ 50    Defendants argue for reversal because at trial, Malek did not limit his testimony to plaintiff's state of mind near the time of his fall, but he also testified about how the fall and subsequent eye injury affected plaintiff's day-to-day life. Defendants contend that such testimony regarding plaintiff's day-to-day life after his fall was not necessary to rebut the contributory negligence defense. Defendants forfeited review by failing to raise this objection at trial. *In re Estate of Doyle*, 362 Ill. App. 3d 293, 303 (2005).

¶ 51    Finally, defendants argue that the court erred in awarding prejudgment interest on the damages award for future disability and future pain and suffering. The court ordered prejudgment interest pursuant to section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), which allows prejudgment interest in actions for personal injury or wrongful death.

Defendants argue that section 2-1303(c) violates the equal protection clause by allowing for the award of prejudgment interest on damages for injuries that will not be suffered until after judgment.

¶ 52    The equal protection clause requires the government to treat similarly situated persons in a similar manner, unless the government demonstrates an appropriate reason for treating them differently. *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 46. The applicable level of scrutiny applied to an equal protection claim is determined by the nature of the impacted right. *People v. Masterson*, 2011 IL 110072, ¶ 24. Strict scrutiny applies when a fundamental right or suspect classification based on race or national origin is involved. *Id.* In the absence of a fundamental right or suspect classification, we apply the rational basis standard, which requires us to determine whether the statute bears a rational relationship to a legitimate government purpose. *Id.*

¶ 53    As a threshold matter, though, the party raising an equal protection claim must show that he is similarly situated to the comparison group. *Id.* ¶ 25. When a party fails to make that showing, his equal protection challenge fails. *Id.*

¶ 54    Defendants here fail to identify the group they are comparing themselves to, nor do they argue they were similarly situated. Defendants also fail to indicate whether the strict scrutiny or rational basis standard applies. Accordingly, their equal protection argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 55    Defendants also argue that section 2-1303(c), which allows the court to award prejudgment interest, invades the jury's province as the exclusive decider of factual issues, thereby impinging on the right to a jury trial. We rejected this same argument in *Cotton v. Coccaro*, 2023 IL App (1st) 220788. We noted that the right to a jury trial guaranteed in the Illinois Constitution attaches to all rights of action known at common law and preserves the jury's right to decide all the facts in controversy, including damages. *Id.* ¶ 47. Prejudgment interest, though, is not a component of

tort damages but a statutory additur applicable upon the satisfaction of certain legislatively defined conditions. *Id.* It is a ministerial function for the trial court, which neither encroaches on the jury's calculation of damages nor penalizes a defendant who elects a jury trial. *Id.* ¶¶ 49-50. Accord *Galich v. Advocate Health and Hospital Corp.*, 2024 IL App (1st) 230134, ¶¶ 61-64, and *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 188-196.

¶ 56    Finally, defendants contend that the "cumulative impact" of the various alleged errors requires that they be granted a new trial. We disagree. There is no reversible error on any individual issue and no cumulative error.

¶ 57    For all the foregoing reasons, we affirm the circuit court.

¶ 58    Affirmed.